Barbara J. BLACKMAN, as Guardian for Meredith A. BLACKMAN, Plaintiff–Appellant,

v.

Robert M. RIFKIN, M.D.; Karl John Heilman, M.D.; Frank Barber, M.D.; Paul Sheridan; the Regents of the University of Colorado; and University of Colorado University Hospital, Defendants–Appellees.

No. 85CA1272.

Colorado Court of Appeals, Div. I.

May 12, 1988.

Rehearing Denied July 14, 1988.

---

Shelly B. Don, P.C., Shelly B. Don, David L. Hiller, Denver, for plaintiff-appellant.

Montgomery Little Young Campbell & McGrew, P.C., David C. Little, Catherine M. Meyer, Englewood, for defendants-appellees.

HUME, Judge.

Plaintiff, Meredith A. Blackman, through her guardian, Barbara J. Blackman, appeals a judgment entered on a jury verdict in favor of defendants, physicians Frank Barber, Robert Rifkin, and Karl John Heilman, on claims of negligent malpractice. The jury also returned a verdict determining that nurse Patricia Dryden Springer, a non-party whose alleged negligence plaintiff sought to impute to the defendant hospital, was not negligent. Plaintiff also appeals the trial court's order directing a verdict for defendant Paul Sheridan, a nursing assistant, on plaintiff's claim of negligence, and in directing verdicts for all individually named defendants on her claims for false imprisonment. We affirm.

The individual defendants and nurse Springer constituted the medical staff (E.R. Team) that treated plaintiff after her admission to the emergency room of the University of Colorado Hospital. Plaintiff sought damages for injuries she suffered as a result of alleged substandard medical care she received from the E.R. Team on August 1, 1982, after she was admitted in a highly intoxicated state with a scalp laceration on the back of her head. While being treated, she apparently regurgitated and aspirated stomach contents into her lungs, resulting in respiratory failure, cardiac ar-

rest, and ultimately in permanent brain damage. The precise moment of regurgitation and aspiration is unknown, but the evidence tended to show that it occurred approximately an hour after plaintiff's admission, while Dr. Rifkin was suturing her head laceration.

## I.

Plaintiff first contends that the trial court erred in refusing to instruct the jury as follows:

"The fact that the Plaintiff's conduct prior to her arrival in the Emergency Room caused or contributed to her medical condition and furnished the occasion for medical treatment is not a defense to the Plaintiff's claim that her medical condition was treated negligently."

In support of her contention, plaintiff relies on *Whitehead v. Linkous,* 404 So.2d 377 (Fla.App.1981); *Matthews v. Williford,* 318 So.2d 480 (Fla.App.1975); *Yardeny v. Fondacaro,* 57 A.D.2d 924, 395 N.Y.S.2d 46 (1977); *Lamoree v. Binghamton General Hospital,* 68 Misc.2d 1051, 329 N.Y.S.2d 85 (1972); *Larson v. Belzer Clinic,* 292 Minn. 301, 195 N.W.2d 416 (1972). However, our review of those cases indicates that they concern factual situations which render them inapposite to the facts presented here.

Some of the cited cases pertain to situations in which the plaintiff's prior negligent conduct was so distinct or remote from the ultimate injury as to render evidence concerning that conduct irrelevant and inadmissible as a matter of law on the issues in the malpractice claim. Others involve situations in which the prior negligent conduct was less distinct and remote and might arguably have had legal relevance, but where no evidence was presented upon which the fact-finder could rationally have found that the prior conduct could have caused the ultimate injuries.

In this case, however, both plaintiff and defendants introduced evidence concerning the degree of plaintiff's intoxication and the symptoms she manifested at the time of her admission and throughout her stay in the emergency room. All parties also introduced evidence concerning professional standards of care that should be followed in diagnosing and treating intoxicated persons, and the difficulty involved in distinguishing whether plaintiff's physical and psychological behavioral symptoms were the result of head trauma or of intoxication.

Substantial evidence was also introduced concerning plaintiff's inability to provide an adequate history to aid the E.R. Team in its diagnostic efforts, and that her continued resistive, combative, and obstructive behavior interfered with the E.R. Team's diagnostic and treatment efforts. Thus, the evidence of plaintiff's intoxication here was neither remote nor distinct from the issues of malpractice. Her intoxication and its resulting effects were highly relevant to the fact-finder's determination of appropriate standards of care and deviations therefrom.

■ Finally, there was evidence that plaintiff's regurgitation and aspiration were the direct result of the physiological effects of alcohol, rather than the result of any act or omission by the E.R. Team. An expert witness testified that alcohol intoxication increases both the likelihood of regurgitation by irritating the stomach, and the likelihood of aspiration by depressing the central nervous system so as to diminish the functioning of protective reflexes which normally prevent aspiration of regurgitated material. He also testified that while certain precautions should be taken to reduce the likelihood of aspiration, no steps could prevent its happening, and that regurgitation and aspiration could occur quickly and in a passive manner not likely to be detected by attending medical professionals. Further, the witness offered his opinion that plaintiff's aspiration and her resulting brain injury was the direct result of her intoxication, and that the E.R. Team did not deviate from the reasonable standards of care required by their respective professions in treating her. Thus, in this case, there was evidence upon which the jury could rationally find that plaintiff's own conduct in becoming intoxicated was

in fact a cause of her ultimate brain damage.

Plaintiff's contention is not that the evidence of her intoxication should have been excluded. Indeed, she contended at trial that her intoxicated condition warranted the E.R. Team's more acute vigilance in protecting her. Nevertheless, plaintiff seeks to insulate her own conduct *in becoming intoxicated* from the jury's consideration as a possible cause of her brain damage. Her proposed instruction acknowledges that her conduct caused the intoxication which existed when she arrived at the emergency room, but seeks to preclude the jury from considering that conduct as a causative factor for her ultimate brain damage. Under the circumstances presented, we conclude such a limitation on the intoxication evidence is not warranted.

Issues of negligence, contributory negligence, and causation are ordinarily questions of fact to be determined by the jury, and the concept of contributory negligence rests on the principle that a plaintiff must exercise a reasonable degree of care to avoid undue risk of harm to himself. *Roberts v. Fisher*, 169 Colo. 288, 455 P.2d 871 (1969); *Fay v. Kroblin Refrigerated Xpress, Inc.*, 644 P.2d 68 (Colo.App.1981). Here, the court gave instructions defining negligence, reasonable care, special standards of care applicable to doctors and nurses, and the word "cause."

The court's definition of "cause," taken from *CJI–Civ.2d* 9:28 (1980), reads in pertinent part:

"If more than one act or failure to act contributed to the claimed injury, then each act or failure to act may have been a cause of the injury. A cause does not have to be the only cause or the last or nearest cause. It is sufficient if the act or failure to act joins in a natural and probable way with some other act or failure to act to cause the claimed injury."

Had the court given plaintiff's offered instruction in this case, it would have told the jury to disregard evidence that plaintiff had deviated from the standard of reasonable care by her excessive drinking, even if the jury determined that that negligence was either a principal cause or the only cause of her ultimate brain damage.

The instruction would, thus, have been in irreconcilable conflict with the correct rule of law incorporated in the instruction on "cause." We therefore conclude that the court did not err in rejecting it.

## II.

Plaintiff also contends that the trial court erred in refusing her proposed amplifying instruction on implied consent. We disagree.

■ The court instructed the jury on the issue of implied consent by giving *CJI–Civ.2d* 15:14 (1980), which sets forth the legal standard applicable to that concept. That instruction correctly sets forth the legal standard of implied consent. Under the instruction given, plaintiff was fully able to argue her theory that suturing was not necessary to the preservation of her life or health, and that the doctor should reasonably have waited for her informed express consent before administering such treatment. The proposed amplifying instruction only reworded and repeated the language of the instruction given by the court. Thus, it was cumulative, and the court did not abuse its discretion in refusing it. *Diversified Management, Inc. v. Denver Post, Inc.*, 653 P.2d 1103 (Colo. 1982); *Montgomery Ward & Co. v. Kerns*, 172 Colo. 59, 470 P.2d 34 (1970).

Plaintiff's reliance on *Federal Insurance Co. v. Public Service Co.*, 194 Colo. 107, 570 P.2d 239 (1977) is misplaced. In that case, the trial court had refused to instruct on the elevated standard of care required of persons engaged in ultrahazardous activities. Although that elevated standard was not then included in the pattern instructions recommended in *CJI–Civ.* (1969), it had previously been approved and followed by authoritative appellate decisions. The Colorado Supreme Court held that, under such circumstances, the trial court had erred in giving the standard instruction on reasonable care which had been included in the 1969 compilation of pattern instruc-

tions. Here, rather than two, only one standard is involved. Moreover, plaintiff has not presented us with, nor are we aware of, any authority requiring the giving of her amplifying instruction.

### III.

Plaintiff next contends that the court erred in dismissing her claims against the E.R. Team members for false imprisonment. We disagree.

■ The evidence is undisputed that symptoms of extreme intoxication coupled with head trauma warranted plaintiff's admission for examination and observation at the emergency room. Plaintiff has conceded, and the evidence supports her concession, that her condition justified the E.R. Team's actions in keeping her in the emergency room in order to prevent further harm to herself or to others. Essentially, the parties agree that the E.R. Team was privileged to restrain plaintiff from leaving, and that the scope of that privilege was commensurate with the consent implied for necessary treatment of plaintiff's medical condition.

All of the witnesses testified that the 21–year–old plaintiff did not want to remain in the emergency room, and that she was abusive and combative in resisting the E.R. Team's efforts to keep her there and to examine her head laceration. Plaintiff's expert witness testified that, under these circumstances, the E.R. Team's decision to use physical restraints was medically necessary and appropriate. Indeed, his testimony indicated that he believed the E.R. Team may have initially used too little restraint, but that the ultimate decision to place plaintiff in a prone position with wrists and ankles strapped to the gurney was appropriate.

Plaintiff contends, however, that even though the E.R. Team had a privilege which justified its actions in confining and restraining her in the emergency room, the specific acts of holding her head, suturing her laceration, and failing to notify her family of her whereabouts, each constituted separate claims for false imprisonment.

We conclude that this contention is without merit.

■ False imprisonment is an unlawful restraint upon a person's freedom of locomotion, or the right to come and go when or where one may choose. *See McDonald v. Lakewood Country Club,* 170 Colo. 355, 461 P.2d 437 (1969). "[T]o confine one intentionally without lawful privilege and against one's consent within a limited area for any appreciable time, however short, constitutes the tort of false imprisonment." 1 F. Harper & F. James, *The Law of Torts* § 3.7 (O. Gray 2d ed. 1986). *See also CJI–Civ.2d* 21:1 (1980).

■ The separate acts in accomplishing and continuing a confinement may be independent torts, distinct from the claim of false imprisonment. *See* 1 F. Harper & F. James, *The Law of Torts* § 3.6 (O. Gray 2d ed. 1986). But here, only one confinement occurred. That consisted of the various acts of the E.R. Team in requiring plaintiff to .remain in the emergency room.

■ Plaintiff also asserted battery claims premised upon the holding of her head and the suturing of the laceration. Those claims were properly presented to, and rejected by the jury. Nevertheless, that restraint and suturing procedure did not constitute independent acts of confinement beyond that authorized by the privilege to confine.

■ Similarly, the failure to notify plaintiff's family of her whereabouts did not render the privileged confinement unlawful. The failure to notify may have been a negligent act, proper for the jury's consideration on the malpractice claims, but it did not constitute a separate confinement. Had the confinement itself not been privileged, the failure to contact the family might have been an aggravating factor relevant to damages.

■ Moreover, confinement resulting from a defendant's negligent act is ordinarily governed by rules of negligence, and it is not actionable under the intentional tort theory of false imprisonment. *See* 1 F. Harper & F. James, *The Law of Torts* § 3.7 (O. Gray 2d ed. 1986). Thus, we conclude

that the court did not err in dismissing the false imprisonment claims.

Plaintiff's other contentions of error are without merit.

Judgment affirmed.

PIERCE and CRISWELL, JJ., concur.