Norma MEDEIROS et al.

v.

James YASHAR, M.D.

89-394-Appeal.

Supreme Court of Rhode Island.

Feb. 26, 1991.

Stephen M. Rappoport, Rappoport, Audette, Bazar & Farley, East Providence, for plaintiff.

Joseph A. Kelly, Carroll, Kelly & Murphy, Providence, for defendant.

Heard Before FAY, C.J., KELLEHER, WEISBERGER, MURRAY, SHEA, JJ.

### OPINION

MURRAY, Justice.

The defendant James Yashar, M.D. (defendant), is appealing a medical malpractice judgment for Norma Medeiros and James Medeiros (collectively, plaintiff). A lengthy jury trial found the defendant not negligent in the actual performance of a medical procedure on Norma Medeiros, but did find for the plaintiff on an "informed consent" theory. The defendant is before us on three objections: (1) that the trial justice improperly admitted portions of the videotaped deposition of the defendant's expert witness, (2) that the trial justice improperly allowed testimony to be introduced on the "community standards" of the extent of disclosure necessary for an informed-consent decision, and (3) that the plaintiff failed to state a prima facie informed-consent case. For the reasons that follow, we affirm the plaintiff's judgment.

In January of 1982, Norma Medeiros was admitted to Miriam Hospital with a diagnosis of pericardial effusion. Her admitting doctor consulted with defendant, a board certified thoracic surgeon. The doctors agreed that a pericardiocentesis (test) should be performed to more accurately diagnose the extent of Norma's malady. Pericardiocentesis is a diagnostic medical procedure whereby a needle is inserted into the chest to obtain a sample of the fluid surrounding the heart. The test is often done in a patient's hospital room. What happened then was any person's worst nightmare. While defendant was performing the test, the needle punctured Norma's heart muscle, causing bleeding and a loss of blood pressure. We repeat that the jury found that defendant had exercised due care in conducting the test and that the complications were not caused by negligence on defendant's part. Norma immediately underwent emergency surgery during which her chest was opened up (a thoracotomy was performed) and fluid was removed from the heart area (the tamponade

was extracted). The surgery was successful, and Norma survived to bring this suit.

The plaintiff filed suit in July of 1983. The plaintiff's two theories of recovery were negligence in performance of the test, and failure to obtain an "informed consent" prior to conducting the procedure. The plaintiff ultimately was successful on the informed-consent theory. It is undisputed that defendant did not tell plaintiff any of the specific dangers associated with the test. The defendant forthrightly states that his policy of twenty-one years has been to tell a patient that there may be "risks" to any given procedure and that if the patient has any specific questions, he will be glad to answer them. Alternatively, defendant describes his policy as always explaining two facts, regardless of whether a procedure is major or minor:

> "One: That there is a mobility,[1] and number two: That there is a mortality. What I mean by mobility [is] that there is a complication and that's * * * part of the risk of the operation or the procedure. By mortality, what I mean is that there is always a risk that there may be death. And I always [elicit] specific questions from the patient, [by telling the patient] that the procedure that I am going to do is a risk and the risks include the mobility and the mortality, and I always ask them [that] if they have any question that they want me to ask [*sic*] about the mortality and about the mobility or the percentage of mobility, I will be more than happy to answer any questions that they may have.

> "This is exactly what I did on Mrs. Norma Medeiros and exactly what I told her and she say [*sic*], Doctor go ahead, I don't have any question."

Nowhere in defendant's warnings does he elaborate on what are the "risks" and "complications" of the test. The defendant maintains that his informing plaintiff as above was sufficient to obtain plaintiff's informed consent.[2]

---

1. This is a direct quote from the transcript. In other portions of the transcript, the word "morbidity" appears. We do not express an opinion as to whether or not the witness misspoke in the present quote, or whether this is a transcription error.

2. The defendant further claims that his warnings were in conformity with community prac-

The case eventually was scheduled for trial in late November to early December of 1988. As that time approached, the trial justice assigned to the continuous jury trial calendar informed the parties that there would be no continuances for unavailability of expert witnesses. To defendant's dismay, one of his experts, Dr. Robert Indeglia, a thoracic surgeon, would be unavailable from November 25, 1988, to December 7, 1988. The defendant contends that the scope of the proposed examination of Dr. Indeglia at trial would be limited to the purpose of showing that defendant was not negligent in performing the procedure. The defendant specifically states that his direct examination would *not* extend to the informed-consent claim, that is, the question of whether defendant had sufficiently informed plaintiff of the hazards and benefits of the test, such that plaintiff could intelligently consent to the test being conducted.

Because of the expected unavailability of Dr. Indeglia, the parties entered into a written stipulation under Rule 26(d)(3) of the Superior Court Rules of Civil Procedure to take a videotaped deposition from Dr. Indeglia. Rule 26(d)(3) states: "At the trial * * * any part or all of a deposition, so far as admissible under the rules of evidence, may be used against any party who was present or represented at the taking of the deposition * * *. (3) * * * A deposition of a medical witness * * * which has been recorded by videotape by written stipulation of the parties * * * may be used at trial for any purpose whether or not the witness is available to testify." After the stipulation was executed, defen-

dant deposed his own expert witness, Dr. Indeglia, by videotaping. On defendant's direct examination, Dr. Indeglia testified regarding his expert credentials, the manner in which the test is performed, the risks of the test,[3] and the actual carefulness exercised by defendant in performing the test on Norma. The defendant also asked Dr. Indeglia whether defendant's care of Norma was within the community standard of like specialists. Doctor Indeglia answered all these questions in a fashion most favorable to defendant.

On cross-examination by plaintiff, plaintiff covered the same subject matters. However, plaintiff purportedly went further and asked Dr. Indeglia what the community standard was in regard to what should have been *disclosed* to plaintiff in order for informed consent to have been made. The colloquy with Dr. Indeglia was quite revealing. Doctor Indeglia emphasized that there were only a handful of specialists like Dr. Indeglia and defendant in the whole state of Rhode Island. Doctor Indeglia denied that he could speak for the other practitioners in the state, but he claimed that his personal practices were representative of the state's medical standards, "since a small number of people make up the standard." The cross-examination by plaintiff was completed by this line of questioning:

"Q. So since you have assumed that you are the standard, [in regard] to telling [a patient of] the risks, you would, in fact, inform the patient of at least the three high risks you mentioned.

---

tice of like expert thoracic surgeons. At trial defendant was questioned:

"Q. Doctor, is it standard medical practice in January of 1982 to disclose all the material risks of the procedure known as pericardiocentesis to the patient, so that the patient can make an intelligent decision as to undertake the procedure or not?

"A. It is not the standard medical practice. It is the standard medical practice to tell to the patient about the risk of the procedure and ask the patient if they want to know what the specific risk of that procedure, and it is up to the referring physician to explain that."

**3.** Doctor Indeglia testified on direct examination that the primary risks are internal bleeding

due to puncture of the heart and arrhythmia (abnormal heartbeat caused by the needle stimulating or irritating the heart). Other lesser risks are vagovagal reactions (slowing of heart rate), which can cause shock. Doctor Indeglia further testified that these risks are innately attendant to the test no matter how carefully the test is performed.

On cross-examination by plaintiff, Dr. Indeglia testified further about the other known risks of the test: cardiac dysrhythmias, ventricular fibrillation, asystole, laceration of cardiac chambers and coronary arteries, air injection into the cardiac chambers causing hydrothorax or pneumotharax, production of cardiac tamponade, and death.

"A. Oh yes.

"Q. And then [you would] go on to say [to the patient that] generally there may be other complications, [so that if] you have any other questions, please ask me.

"A. Correct.

"Q. So if Dr. Yashar, in this case, only said to Mrs. Medeiros, I'm going to do this procedure; there may be complications; ask me any questions, that deviated from the standard of medical practice as you knew it as it existed in January of '82?

"A. As I would say it, yes."

■■■ The defendant's first complaint of error is that there is no legal significance to Dr. Indeglia's testifying live on the stand as distinguished from the playing of his videotaped deposition. The defendant emphasizes that Rule 26(d) states that depositions are admissible at trial "so far as admissible under the rules of evidence." Under Rule 611(b) of the Rhode Island Rules of Evidence, the scope of a cross-examination is limited to the subject matter of the direct examination. Thus, defendant concludes that plaintiff's line of questioning was beyond the subject matter of his direct questioning and is barred by Rule 611. The defendant argues that in this special type of deposition, a deposition in which a party is deposing his own expert because of the expected unavailability of the expert, the scope of the deposition's cross-examination should be limited to the subject matter of the deposing party's direct examination.

The plaintiff replies that Rule 26 also states, in subsection (d)(3), that a medical expert's videotaped deposition will be admissible at trial by either party for any purpose.

We think the crux of defendant's argument depends on whether the terms "direct examination" and "cross-examination" mean the same thing for purposes of a deposition and for purposes of courtroom testimony. We do not think they are. We are aided by examining Rule 26(f), which states, "A party shall not be deemed to make a person his or her own witness for any purpose by [virtue of] taking his deposition." Rather, it is "[t]he introduction in evidence of the deposition or any part thereof for any purpose other than that of contradicting or impeaching the deponent [that] makes the deponent the witness of the party introducing the deposition." Essentially, Rule 26(f) states that the scope of the cross-examination in a deposition is not limited to the subject matter of the deposing party's direct examination, since the deponent is not anyone's witness. Therefore, presuming other procedural and evidentiary rules are complied with, a statement made on cross-examination in a deposition shall not be inadmissible at trial merely because the question was not a subject of the deposition's direct line of questioning. Further, by virtue of Rule 26(d)(3), plaintiff could properly get Dr. Indeglia's testimony admitted at trial for the purpose of assisting plaintiff in the informed-consent theory of liability.

■■ The defendant's second complaint of error is that he believes only the defendant in an informed consent case can offer the "community standard" of the medical field. He states that the only time the community standard may be used is by a defendant, in his or her attempt to *disprove* an allegation of failure to adequately inform a patient. The defendant claims that the seminal case of *Wilkinson v. Vessey*, 110 R.I. 606, 623, 625, 295 A.2d 676, 687, 688 (1972), absolutely prohibits plaintiff from offering the community standard because "[e]ach patient-physician relationship may present facts which are unknown to other physicians. The amount of disclosure can vary from one patient to another. * * * The doctor-patient relationship is a one-on-one affair. What is a reasonable disclosure in one instance may not be reasonable in another."

Let us make clear what our holding was in *Wilkinson*. In *Wilkinson* we said that it was not essential to establishing a prima facie case for an informed-consent plaintiff to have medical testimony concerning what is the community standard of disclosure. *Id.* at 624–25, 295 A.2d at 688. We recognized that a patient has a right to have full disclosure of all material facts. "Materiality may be said to be the significance a

reasonable person, in what the physician knows or should know is his patient's position, would attach to the disclosed risk or risks in deciding whether to submit or not to submit to surgery or treatment." *Id.* at 627, 295 A.2d at 689. In stating that "[b]lind adherence to local practice is completely at odds with the undisputed right of the patient to receive information which will enable him to make a choice * * * [a] patient's right to make up his mind should not be delegated to a local medical group," *id.* at 625, 295 A.2d at 688, we were implicitly recognizing the possibility that the whole community could have negligent standards of disclosure. *See The T.J. Hooper,* 60 F.2d 737, 740 (2d Cir.1932) ("in most cases reasonable prudence is in fact common prudence; but strictly it is never its measure"). This is the evil that is associated with the introduction of community standards and that *Wilkinson* was intended to address: that a defendant could convince a jury that he was not negligent merely by showing that he acted in conformity with the community. *Wilkinson* avoids this problem by stating that not only is a plaintiff not required to show a defendant's nonconformity with the community but also a defendant cannot avoid liability solely by showing conformity.

The concern that everyone in a certain field may be negligent is not present in the instant case in which *plaintiff* is using nonconformity with community practice to demonstrate defendant's negligence. Therefore, just as *Wilkinson* allows a defendant to introduce evidence of conformity with the community as evidence of non-negligence, 110 R.I. at 626, 295 A.2d at 688, so too can this plaintiff introduce evidence of defendant's nonconformity with the community as evidence of negligence. We note that this holding is consistent with *Wilkinson* 's comment that the warnings a doctor gives will vary from patient to patient. We are holding today that a plaintiff may introduce evidence of what the community standard of disclosure is for *this plaintiff,* not for the average pericardiocentesis patient. Hence, we hold that the trial justice did not err in allowing Dr. Indeglia and another

expert to testify about the community standard for proper disclosure to plaintiff.

The defendant's third and final complaint is that our case of *Beauvais v. Notre Dame Hospital,* 120 R.I. 271, 276, 387 A.2d 689, 692 (1978), requires a plaintiff to present "evidence regarding the severity or likelihood of [the risks of a procedure] so that [the] jury could determine the materiality of those risks to a reasonable person in plaintiff's position."

The defendant is absolutely correct when he states that it is generally insufficient for a plaintiff merely to present evidence on the dangers of a procedure; she must also present evidence on the incidence or likelihood of each of those dangers. In most cases, the incidence of a known risk is an essential (although not determinative) factor that the jury must hear evidence on, so that it can decide whether the particular risk is "material" and must be disclosed. *See id.* at 276, 387 A.2d at 692; *Wilkinson,* 110 R.I. at 627–28, 295 A.2d at 692. However, we strongly disagree with defendant that the above rule of law calls for a hard and fast rule that plaintiff must show a "percentage likelihood of occurrence." We require only that a plaintiff present some credible evidence of the incidence of each of the relevant known risks.

The defendant correctly points out that the plaintiff has failed to produce *any* evidence on the likelihood of any of the dangers associated with the test. Nevertheless, we are not bound to overturn the plaintiff's verdict. We rule that the defendant's confusing and uninformative "mobility and mortality" lecture was insufficient as a matter of law to allow the plaintiff to informedly consent to the test. Our case law clearly mandates that a patient must be informed of the particular material risks of an operation. *Wilkinson,* 110 R.I. at 625, 295 A.2d at 688. Stating that risks exist, as the defendant did in this case, is not the same as stating what those risks are. Absent being particularly informed of the known material risks, a patient cannot intelligently ask questions concerning the procedure, nor can the patient informedly consent. Here we rule as a matter of law

that the plaintiff did not have *any* information on which an informed decision could have been made.

The defendant's appeal is denied and dismissed. The judgment of the Superior Court is affirmed. The papers of the case are remanded back to the Superior Court.

WEISBERGER, Justice, (concurring in the result).

I agree with the result reached by Justice Murray and the Chief Justice and with all the reasoning set forth in support of that result save that portion of the opinion which indicates that depositions, whether videotaped or otherwise, that are introduced at trial need not conform to the rules of evidence, including those rules that apply to the scope of cross-examination.

I am of the opinion that pursuant to Rule 26(d) of the Superior Court Rules of Civil Procedure, a deposition, when introduced at trial, must be subject to the same rules of evidence that would apply if the witness were there testifying in person. It must be noted that there are two purposes in the use of depositions. One purpose is that of discovery. In this connection, the rules of evidence do not play a significant role so long as the subject matter sought to be elicited either is relevant to the subject matter involved or is reasonably calculated to lead to the discovery of admissible evidence. With this limitation, there is no ground for objection in a discovery deposition that the testimony will be inadmissible at the trial. Super. R. Civ. P. 26(b)(1). Similarly, pursuant to Rule 26(c) cross-examination of a deponent need not be limited to the subject matter of the examination in chief. It is important to observe that the foregoing rules are applicable to depositions taken for purposes of discovery.

In contrast, depositions, when introduced at trial, must conform to the rules of evidence as though the witness were live and testifying before the tribunal. Professor Kent points out that the broad latitude accorded parties in obtaining pretrial discovery, including the taking of depositions, is not matched by the extent to which depositions may be used at the trial according

to Rule 26(d). "The test is whether the specific question and answer sought to be introduced would be admissible were the witness present and testifying on the witness stand." 1 Kent, *R.I. Civ. Prac.* § 26.17 at 231 (West 1969). *See also DeCarvalho v. Gonsalves,* 106 R.I. 620, 627, 262 A.2d 630, 634 (1970).

Although our rules of civil procedure were derived from the Federal Rules, the 1970 amendment to the Federal Rules included a new Rule 32(a) of the Federal Rules of Civil Procedure. This rule simply reemphasizes the principle that a deposition may be used at trial or upon the hearing of a motion or other proceeding "so far as admissible under the rules of evidence applied as though the witness were then present and testifying." *Id. See* 8 C. Wright & A. Miller, *Federal Practice and Procedure:* Civil § 2143 (1970). Consequently I believe that defendant was correct in asserting the proposition that, when used at trial, the cross-examination of a witness deposed must be conducted within the scope of the subject matter of the deposing party's direct examination. The inquiry does not end here, however. It must be determined whether under the application of traditional standards the trial justice committed error in allowing the cross-examination of Dr. Indeglia on the subject of informed consent.

We have frequently stated that the scope of cross-examination lies within the sound discretion of the trial justice and will be reviewed only for abuse of that discretion. *See, e.g., State v. Brennan,* 526 A.2d 483 (R.I.1987); *State v. Benevides,* 420 A.2d 65 (R.I.1980). We have also stated that the subject matter of cross-examination includes inquiry that may contradict or explain the matter raised on direct examination or the inferences that may be drawn therefrom. *See State v. Soto,* 477 A.2d 945, 949 (R.I.1984); *State v. Crowhurst,* 470 A.2d 1138, 1143 (R.I.1984). This is a flexible standard. In the case at bar the testimony of Dr. Indeglia was extremely favorable to defendant. His testimony had suggested that defendant had met the standard of due care in all respects relating to

his treatment of plaintiff. The question of informed consent bears upon the issues of due care and negligence. *See Wilkinson v. Vesey,* 110 R.I. 606, 621, 295 A.2d 676, 686 (1972), wherein the court observed, "Where, as here, the procedure is authorized but the patient claims a failure to disclose the risks involved to a course of therapy, the claim sounds in negligence." Consequently it was not an abuse of discretion for the trial justice to allow inquiry on cross-examination to be admitted into evidence on the subject of the standard of care to be applied in respect to informed consent.

Since the cross-examination in this case on the issue of informed consent was admitted by the trial justice without violating the traditional evidentiary standards, I reach the same result as did Justice Murray and the Chief Justice—but by a different route.

For the reasons stated, I concur in the result. Justice KELLEHER and Justice SHEA, join in this concurring opinion, thus constituting a majority of the court on this issue.