Craig L. MILLER

v.

RHODE ISLAND HOSPITAL et al.

No. 92–407–A.

Supreme Court of Rhode Island.

June 3, 1993.

Jeffrey Brenner, Corrente, Brill & Kusinitz, Providence, for plaintiff.

Neal McNamara, Flanders & Medeiros, Providence, for defendant.

S. Michael Levin, Edwards & Angell, Providence, Paul Gebhard, Robert Portman, Chicago, IL, for amicus curiae.

## OPINION

FAY, Chief Justice.

This matter is before us on the appeal of the defendant, Rhode Island Hospital (hospital), from a Superior Court judgment. An attending physician at the hospital had performed a surgical procedure over the objections of the plaintiff, Craig L. Miller. A jury found the hospital liable for battery and awarded the plaintiff $10,000 in compensatory damages and $100 in punitive damages.[1] On appeal the hospital asserts that the trial justice erred by refusing to admit certain testimony and by incorrectly instructing the jury. The facts insofar as they are pertinent to this appeal are as follows.

The jury trial commenced on April 23, 1992. The plaintiff testified that on February 12, 1987, he had approximately two alcoholic beverages with his lunch at the Twin Oaks restaurant. He and his companion, Bob Harty (Harty), left the restaurant at about 3 p.m. The plaintiff estimated that from approximately 5 p.m. to 8:45 p.m. he consumed between five and ten additional drinks at the Barnsider restaurant. After leaving the Barnsider, plaintiff was a passenger in Harty's car when it was hit by an oncoming motor vehicle. The plaintiff was not wearing a seat belt at the time of the accident and sustained lacerations over his right eye, on the bridge of his nose, and on the right side of his forehead. He also suffered a bruise to his ribs.

Rescue personnel arrived at the accident scene and transported plaintiff to the hospital. When plaintiff was admitted to the hospital, his condition was treated as a surgical emergency. He was transported to a trauma room where he was evaluated by three trauma-team physicians and diagnostic tests were performed. Blood was drawn, X rays were taken, and a catheter was inserted to check for blood in plaintiff's urine. The defendant's expert, Dr. John DeFeo, testified that when plaintiff was admitted into the hospital, he had the equivalent of sixteen alcoholic drinks in his blood. It was undisputed at trial that plaintiff's blood-alcohol content was 0.233.

The plaintiff was asked where he was injured, and he responded that his head, eyes, back, and ribs caused him pain. Throughout this time plaintiff could not see because his eyes were covered in blood. After the initial tests had been completed, plaintiff's fiancée, Tracy Nickerson (Nickerson), was brought into the trauma room to speak with him. After Nickerson left the room, Dr. Philip Falcone asked her to consent to treatment on plaintiff's behalf. Nickerson informed Dr. Falcone that she could not consent because she was merely plaintiff's fiancée. She told him that she would call plaintiff's sister, who lived nearby and who could be at the hospital within a few minutes. Nickerson immediately

1. At trial BPS Guards Services, Inc., d.b.a. Wells Fargo Guard Services, a Baker Industries company, was a codefendant. The jury determined that the actions of the Wells Fargo security guard who assisted hospital personnel in restraining the plaintiff did not constitute negligence or battery. This party did not participate in the appeal.

called plaintiff's sister, and she arrived at the hospital within ten minutes.

The plaintiff further testified that he learned that a diagnostic peritoneal lavage was going to be performed when he overheard one of the doctors instruct someone to prepare him for an abdominal incision.[2] The plaintiff began questioning a doctor and was briefly instructed on what would occur. The plaintiff responded, "[N]o, I don't want you to do that," and attempted to sit up and engage the doctor in a dialogue. The plaintiff stated that he could feel his body perfectly well. He claims that the doctor responded, "Since you have been drinking, you're not in a position to know the extent of any injuries, and this is our standard procedure for a situation of this kind." The plaintiff stated that the doctor did not ask him to consent to the procedure, nor did the doctor inquire into the availability of immediate family members.

After the doctor informed plaintiff that it was the hospital's policy to perform a lavage under these conditions, plaintiff attempted to get up. The doctor tried to restrain plaintiff, and plaintiff started yelling. The plaintiff testified that the doctor pushed him, plaintiff struggled, and the doctor called a security guard. The plaintiff was subsequently restrained, strapped to a gurney, and administered anesthesia through a syringe. When plaintiff regained consciousness, he saw that the procedure had left a three-inch-long incision on his stomach. The plaintiff left the hospital the next morning against medical advice.

I

■ The first issue before us is whether the trial court erred when it refused to admit evidence concerning plaintiff's prior compensation. During cross-examination of plaintiff, the trial justice ruled on a motion in limine concerning plaintiff's compensation by Harty's automobile insurer. Pursuant to an insurance settlement, plain-

tiff had been compensated for his medical expenses, lost wages, and pain and suffering resulting from the injuries he sustained in the car accident. In return, plaintiff released Harty from further liability. The trial justice excluded any evidence of plaintiff's prior settlement with Harty's motor-vehicle insurer because its probative value would be outweighed by its prejudicial effect. The hospital claims that the court erred by not allowing evidence that plaintiff had been previously paid by Harty's insurer.

It is well settled that the trial justice may exclude evidence "if its probative value is substantially outweighed by the danger of unfair prejudice." Rule 403 of the Rhode Island Rules of Evidence. It is within the trial justice's discretion to determine the effect of evidence submitted. *State v. Grundy*, 582 A.2d 1166, 1172 (R.I. 1990). We find no error in the trial justice's exclusion of plaintiff's recovery for damages against Harty's insurer. The plaintiff received compensation from the insurance company for damages arising out of the automobile accident. Such recovery is unrelated and prejudicial to plaintiff's medical-malpractice action against the hospital for alleged battery.

II

We next turn to several interrelated issues at the center of defendant's appeal. After plaintiff presented his case, the hospital attempted to introduce the testimony of Dr. Kevin Vigilante. Doctor Vigilante began to testify concerning plaintiff's intoxication and the treating physicians' determination of a medical emergency. At that point the trial justice removed the jury to allow him to consider the witness's testimony as an offer of proof.

Doctor Vigilante testified that the existence of a medical emergency required hospital personnel to perform a diagnostic peritoneal lavage. He stated that plaintiff's very high blood-alcohol level and the cir-

---

**2.** The procedure known as a diagnostic peritoneal lavage involves making a small incision in the abdomen in order to place a catheter inside the abdominal cavity. The catheter is connect- ed to tubing through which a fluid runs. The fluid washes the inside of the abdominal cavity and is then removed. An examination of the fluid reveals whether there is internal bleeding.

cumstances of his accident triggered the medical emergency. Doctor Vigilante testified that intoxicated patients fall within the class of people who are not competent to consent to surgery. Doctor Vigilante stated that when a patient is brought into the emergency room in a condition that is potentially life threatening, a physician must rely on information about the nature of the accident to assess the probability that there may be internal injuries. Doctor Vigilante said that under national standards established by the American College of Surgeons, a physician must consider both the mechanism of injury and the question of whether the person is intoxicated to determine which diagnostic methods to use on an accident victim. The mechanism of injury indicates the possibility of internal injuries. Furthermore, when the trauma victim is intoxicated, doctors cannot rely on the usual physical examination and medical history to evaluate the extent of injury because the patient's judgment is impaired to the point that the patient is unable to sense pain accurately. Because an abdominal injury is potentially life threatening, prompt action is required to avert the possibility of a sudden drop in blood pressure and to prevent the patient's lapse into an irretrievable condition. Therefore, Dr. Vigilante testified, the standards of the American College of Surgeons obligate a physician to perform a peritoneal lavage on intoxicated patients who undergo trauma.

The trial justice ruled that Dr. Vigilante's testimony concerning medical emergency was inadmissible. He asserted that the statements in the offer of proof were immaterial. The trial justice found that the subject testimony addressed the issue of medical competency to consent in light of intoxication. He indicated that medical competency was entirely different from legal competency. Legal competency, the trial justice stated, is an assumption that an individual has a presumptive right to informed consent. In contrast a determination of medical competence is the result of a fact-based, subjective evaluation of whether an individual has the ability to

consent to treatment and what treatment is in the individual's best interest.

After the trial justice ruled on Dr. Vigilante's testimony, Dr. DeFeo, a pharmacologist, testified on the amount of alcohol that was in plaintiff's blood stream. After an explanation of the meaning of blood-alcohol content, defense counsel queried whether Dr. DeFeo had an opinion to a reasonable degree of scientific certainty concerning the effect of 0.233 blood-alcohol content upon a person of plaintiff's height and weight. The trial justice refused to allow the witness to offer an opinion. He ruled that the effect of intoxication is immaterial because it does not affect a patient's legal competence.

Later in the course of the trial the hospital attempted to present the expert testimony of Dr. Charles Mock. Doctor Mock was a surgical resident on the trauma service at the time plaintiff was treated. The trial justice treated Dr. Mock's testimony as an offer of proof and heard it without the jury present. Doctor Mock read notes from the medical records that stated that plaintiff was intoxicated, combative, and uncooperative. He testified about the special problems a trauma physician faces when treating an intoxicated patient who has been an unrestrained passenger in a high-speed motor-vehicle accident. In such situations, he stated, time is very much of the essence.

Doctor Mock testified that the hospital had an established protocol concerning peritoneal lavage and informed consent. A nonconsensual lavage is warranted if two factors are present. First, one must consider if the mechanism of the accident is of a kind that is likely to cause internal injuries, such as a car accident or a fall from a height. Second, a lavage is needed if a patient's mental status is impaired by drugs, alcohol, or an injury to the head such that the patient cannot sense or report symptoms of internal bleeding. Doctor Mock stated that it was the hospital's standard procedure to treat trauma victims with blood-alcohol levels in excess of 0.10 by performing a lavage despite the lack of that patient's consent.[3] Doctor Mock con-

---

**3.** In Rhode Island a finding of 0.10 blood-alcohol content is definitive proof that a motorist is

cluded that plaintiff was treated according to the hospital's protocol. He further testified that this was a national standard put forth by the Committee on Trauma of the American College of Surgeons.

The trial justice rejected Dr. Mock's offer of proof concerning plaintiff's competency to consent to the lavage. In explaining his decision, he elaborated on his earlier rulings. The trial justice reviewed our opinion in *Wilkinson v. Vesey,* 110 R.I. 606, 295 A.2d 676 (1972), and rendered his interpretation of the law of informed consent. Relying upon *Wilkinson* and its progeny, the trial justice stated that a doctor may not perform a surgical procedure without a patient's consent if that person is conscious and of sound mind. He declared that intoxication does not affect the patient's competence to consent. The trial justice ruled that the question of whether plaintiff was intoxicated was immaterial because

"I know of no decision anywhere where it is said that a person who is intoxicated, is not of sound mind, to wit, is not legally competent. * * * A person whose judgment is impaired because of intoxication, may make the wrong choice. But that choice is made not because of incompetency, but because if the person was sober, the person would not have made that choice, and here is the essential distinction, as this Court sees it, this plaintiff, when he got up that morning, presumed he was legally competent, and he was legally competent when he sobered up. This Court does not believe that the fact of intoxication, creates a state of temporary incompetency, which permits the hospital to perform a procedure against a patient's will."

As would be consistent with his ruling, the trial justice instructed the jury on the issue of whether intoxication vitiates a patient's mental capacity to consent. He stated:

"So, those are the two elements that are necessary for you to look at; the hospital having to show you by a fair preponderance of the evidence that when

that procedure was performed, Mr. Miller was not of sound mind and there simply was not a reasonable time to get somebody's approval. The concept being a person of unsound mind is not capable of giving consent. A person who is of sound mind is not rendered of unsound mind by reason of intoxication. A person who is of sound mind when sober does not become an individual of unsound mind because he is intoxicated. A person's judgment may be impaired by intoxication. But the impairment of judgment by intoxication does not render a person of unsound mind.

\* \* \* \* \* \*

"When I speak to you about a person of unsound mind, I speak about a person who is of such impairment of mental capacity—is that degree of mental capacity as rendered that person to understand and deal with the common affairs of life. That is what we mean when [w]e talk about a person of such a degree of mental capacity as to be unable to understand the common affairs of life."

The hospital objected to both the rulings and the instructions. The hospital claims that in his rulings and instructions the trial justice erred in three respects. The hospital argues that legal competence is an inappropriate test to determine a patient's ability to make medical-treatment decisions, that an unsound mind is not the standard for competence to consent, and that the trial justice failed to acknowledge the effect of intoxication on plaintiff's ability to consent. The hospital claims that the trial justice erroneously excluded the testimony of its witnesses, Doctors Vigilante, DeFeo, and Mock. The hospital contends that by excluding their testimony, the trial justice prevented it from fully presenting the defense that intoxication and emergency vitiated plaintiff's consent. In support of defendant's argument an amicus curiae brief was filed by the American College of Surgeons and the American Medical Association.

driving while intoxicated. *State v. Lussier,* 511 A.2d 958, 960 (R.I.1986); G.L.1956 (1982 Reenactment) § 31–27–2(b)(1), as amended by P.L. 1992, ch. 418, § 5.

The crux of the trial justice's rulings and instructions was that, as a matter of law, the hospital was not permitted to follow the protocol it outlined in its offers of proof. He ruled that the doctors' testimony was immaterial because Rhode Island law does not permit a doctor to consider a patient's alcohol-impaired judgment when making a treatment decision that requires prior consent. The trial justice's rulings and instructions struck at the heart of a continuing controversy between lawyers and the medical profession. The societal interests of individualism and medical treatment are in constant competition in the process of medical decision making. The doctrine of informed consent in the medical context has spawned volumes of legal literature that delineate its role as the guardian of individualism. *See Canterbury v. Spence*, 464 F.2d 772, 780 n.15 (D.C.Cir.), *cert. denied*, 409 U.S. 1064, 93 S.Ct. 560, 34 L.Ed.2d 518 (1972); *Wilkinson*, 110 R.I. at 620 n.7, 623–24, 295 A.2d at 685 n.7, 687. The doctrine protects the patient's common-law right to be free from nonconsensual bodily invasion and the liberty to determine one's own destiny in medical matters. By promoting these values, however, the doctrine may conflict with the counterveiling values of prompt medical action and trust between a physician and his or her patient. *See Wilkinson*, 110 R.I. at 624, 295 A.2d at 687. In this sea of competing interests, the case at bar compels us to chart a course between the perils of insufficient emergency medical care and violation of a patient's individual liberty.

The hospital avers that the trial court's rulings and instructions on the issue of an intoxicated patient's capacity to consent create an untenable quandry for physicians who are asked to treat intoxicated patients in emergency conditions. It argues, at one end of the spectrum, that if a physician performs an emergency procedure against the express wishes of a patient whose judgment is severely impaired by alcohol, drugs, or a medical condition, the physician will risk liability for battery. Conversely, if the physician accepts the patient's refusal, the physician runs a significant risk of incurring malpractice liability for failing to provide necessary treatment. This dilemma may delay the delivery of prompt emergency medical services for patients who are in need of such treatment.

## III

The multiple issues in this matter require us initially to peel back the layers of legal standards before passing the trial justice's actions through our standard of review. The trial justice applied the same interpretation to his evidentiary decisions as he did to the instructions he posed to the jury. In our analysis, therefore, we evaluate the trial justice's evidentiary rulings and his jury instructions together.

## A

■ Our jurisprudence guarantees that a patient has a right to control his or her body and to make an informed decision regarding medical treatment. As Justice Cardozo stated in *Schloendorff v. Society of New York Hospital*, 211 N.Y. 125, 129–30, 105 N.E. 92, 93 (1914), "Every human being of adult years and sound mind has a right to determine what shall be done with his own body; and a surgeon who performs an operation without his patient's consent, commits an assault, for which he is liable in damages." *See Wilkinson*, 110 R.I. at 619, 295 A.2d at 685. After the *Schloendorff* case the consent doctrine was modified so that a patient's agreement to a proposed course of treatment is legally effective "only to the extent [that the patient has] been informed by the physician as to what [is] to be done, the risk involved and the alternatives to the contemplated treatment." *Wilkinson*, 110 R.I. at 619–20, 295 A.2d at 685.

We adopted and expanded upon many of the modern standards of informed consent in our *Wilkinson* decision. In *Wilkinson* we recognized that a patient has a right to have full disclosure of all material facts. We defined materiality by an objective standard, considering what the physician knows or should know about the patient's position. *Id.* at 627, 295 A.2d at 689. We underscored that central to the doctrine of

informed consent is every competent adult's right to forego treatment. *Id.* at 624, 295 A.2d at 687. The doctrine and its underlying goals are, however, limited when an emergency exists.[4] *Id.* at 622–24, 295 A.2d at 686–88.

■ Equally as well established as the informed consent doctrine is the exception to it for emergencies. *See* A. Meisel, *The "Exceptions" to the Informed Consent Doctrine: Striking a Balance Between Competing Values in Medical Decisionmaking,* 1979 Wis. L.Rev. 413, 430–38. This court has stated that the requirement of informed consent applies "in [the] absence of an emergency." *Wilkinson,* 110 R.I. at 622, 295 A.2d at 686; *see Nolan v. Kechijian,* 75 R.I. 165, 168, 64 A.2d 866, 867 (1949) (informed consent required "unless an immediate operation is urgently and reasonably necessary").[5] The *Schloendorff* court also held that informed consent does not apply "in cases of emergency where the patient is unconscious and where it is necessary to operate before consent can be obtained." 211 N.Y. at 130, 105 N.E. at 93.

The elements of the emergency exception to informed consent are set forth in the seminal case of *Canterbury v. Spence, supra. See also* A. Meisel, 1979 Wis. L.Rev. at 435–38 (emergency exists when objectives and values of informed-consent doctrine are no longer served). The *Canterbury* court observed that the exception

"comes into play when the patient is unconscious or otherwise incapable of consenting, and harm from a failure to treat is imminent and outweighs any harm threatened by the proposed treatment. When a genuine emergency of that sort arises, it is settled that the

impracticality of conferring with the patient dispenses with need for it. Even in situations of that character the physician should, as current law requires, attempt to secure a relative's consent if possible. But if time is too short to accommodate discussion, obviously the physician should proceed with the treatment." 464 F.2d at 788–89.

In *Wilkinson* we adopted the *Canterbury* informed-consent standard concerning the use of expert testimony and the appropriate standard of care. 110 R.I. at 624–25, 295 A.2d at 688. We believe that the *Canterbury* court's explanation of the emergency exception is a natural addition to the progeny of our *Wilkinson* decision. *See supra* note 4.

B

■ To prevent the physician's emergency-treatment privilege from devouring the disclosure rule itself, it must be carefully circumscribed. Under the emergency exception a medical-care provider should seek the consent of the patient or, if the patient is incapable of providing consent, the consent of a family member before administering treatment. *Canterbury,* 464 F.2d at 789. The impracticality of conferring with the patient is a prerequisite to dispensing with informed consent under the emergency exception. *Id.* at 788–89. A physician must respect the refusal of treatment by a patient who is capable of providing consent, even in an emergency. In order for the trier of fact to decide whether an emergency existed, a factual inquiry should be undertaken to determine whether a patient was capable of consenting or objecting to emergency treatment.

---

**4.** In the aftermath of *Wilkinson v. Vesey,* 110 R.I. 606, 295 A.2d 676 (1972), we have fine-tuned the process and elements of informed consent. *See Medeiros v. Yashar,* 588 A.2d 1038 (R.I.1991); *Beauvais v. Notre Dame Hospital,* 120 R.I. 271, 387 A.2d 689 (1978); *Schenck v. Roger Williams General Hospital,* 119 R.I. 510, 382 A.2d 514 (1977); *Marshall v. Tomaselli,* 118 R.I. 190, 372 A.2d 1280 (1977).

**5.** All states recognize a legal exception in requirements for informed consent in clinical

emergencies. P. Grim et al., *Informed Consent in Emergency Research: Prehospital Thrombolytic Therapy for Acute Myocardial Infarction,* 262 JAMA 252, 253 (1989). *See* L. Goldstein & M. Zaremski 3 *Medical and Hospital Negligence,* § 55:09 (1990); D. Louisell & H. Williams, vols. 1 & 2 *Medical Malpractice,* ¶¶ 9.06, 22.06 (1990); *see also* Restatement (Second) *Torts* § 892D (1979) (emergency action without consent does not make the actor liable).

■ In the case before us the hospital attempted to demonstrate that it satisfied the *Canterbury* emergency standard. It offered to prove that an emergency existed and that plaintiff's high degree of intoxication impaired his ability to consent or to object to emergency treatment. The trial justice rejected the hospital's offers of proof as immaterial in part because testimony on medical capacity was necessarily irrelevant to the standard of legal capacity. We agree with the trial justice's premise but disagree with his ruling. Legal competence and medical competence *are* two different standards. That a person is legally competent does not, however, mean that the person is capable of making medical decisions.

■ The trial justice's presumption that a patient must be legally incompetent or of unsound mind in order for a hospital to dispose of the informed-consent requirement is too broad. "The inability to 'govern' one's self and manage one's other affairs does not necessarily preclude the ability to make a decision to forego * * * medical treatment." *In the Matter of Conroy*, 98 N.J. 321, 383, 486 A.2d 1209, 1241 (1985). A judicial or statutory presumption of general incompetence differs from a determination that a patient lacks the capacity to make medical decisions. *Id.* at 382–83, 486 A.2d at 1241; *see Younts v. St. Francis Hospital & School of Nursing, Inc.*, 205 Kan. 292, 300–01, 469 P.2d 330, 337–38 (1970) (legal capacity different from medical capacity, therefore, minor's consent valid); *Cardwell v. Bechtol*, 724 S.W.2d 739, 749 (Tenn.1987) (minor can consent to medical treatment).[6] We conclude that a finding of legal incompetence or unsound mind is not a prerequisite to determine that a patient lacks the ability to make decisions regarding treatment. *See State Department of Human Services v. Northern*, 563 S.W.2d 197, 209 (Tenn. Ct. App.), *appeal dismissed as moot*, 436 U.S. 923, 98 S.Ct. 2816, 56 L.Ed.2d 767 (1978) (mental capacity not necessarily synonymous with sanity). A patient's competency to consent to a medical procedure is therefore a justiciable matter that the trier of fact must resolve. *In the Matter of Schiller*, 148 N.J.Super. 168, 173, 372 A.2d 360, 363 (1977); *Grannum v. Berard*, 70 Wash.2d 304, 307, 422 P.2d 812, 814 (1967).

■ Having said that the capacity to make medical decisions need not be synonymous with one's sanity or legal competence, we must take another step down the *Wilkinson* path and touch upon what *is* the appropriate standard for the capacity to consent to medical treatment. In this excursion we rely on a consensus emerging among other states. Several courts have applied the standard of mental capacity used for one's capacity to contract. New Jersey courts pronounced that "[t]he mental capacity to give consent to a surgical procedure is the same as that required to enter into a contract." *Schiller*, 148 N.J.Super. at 180, 372 A.2d at 367; *see Conroy*, 98 N.J. at 382–83, 486 A.2d at 1241. We therefore evaluate mental capacity according to the particular circumstances involved rather than derive it from a general presumption. *Grannum*, 70 Wash.2d at 307, 422 P.2d at 814; *see Schiller*, 148 N.J.Super. at 180–81, 372 A.2d at 367.

In *Schiller* the court evaluated whether a special guardian could consent to the amputation of the patient's right leg. In its analysis the court considered the mental capacity of the patient to consent to urgently needed treatment. The court stated that the test for mental capacity to consent to medical treatment is whether the patient has "sufficient mind to reasonably understand the condition, the nature and effect of the proposed treatment, [and the] attendant risks in pursuing the treatment,

---

**6.** Areas of Rhode Island law demonstrate the disparity between legal competence and the competence required to perform certain acts. For example, in G.L.1956 (1989 Reenactment) § 23–4.7–6 the Legislature recognized that a minor who is presumed incapable of giving informed consent to an abortion may overcome that presumption should a judge find her capable and mature enough to consent. Moreover, in *State v. Cabral*, 122 R.I. 623, 628–29, 410 A.2d 438, 442 (1980), we recognized that a minor may be adjudged competent to testify at trial should the minor meet certain criteria.

and not pursuing the treatment[.]" 148 N.J.Super. at 180–81, 372 A.2d at 367; *see Conroy*, 98 N.J. at 382–83, 486 A.2d at 1241. We agree that this standard accounts for relevant concerns and is the appropriate measure of capacity in emergency medical decision making. Furthermore, a contract-based test of mental capacity that includes an assessment of the patient's understanding of the risks and consequences of the surgery is appropriate when the patient's mental condition is the result of intoxication. *Grannum*, 70 Wash.2d at 307, 422 P.2d at 814.

## C

█ The trial justice also ruled and instructed the jury that intoxication does not affect a patient's competence to consent to treatment. We disagree.

Intoxication is a condition that courts have found may impair an otherwise competent patient's capacity to consent or to object to medical treatment. In a case involving facts nearly identical to this matter, a New York appellate court found that whether a patient was too intoxicated to refuse emergency medical treatment was a question of fact for the jury. *Oates v. New York Hospital*, 131 A.D.2d 368, 370, 517 N.Y.S.2d 6, 7 (1987). In *Oates* the patient arrived at the defendant hospital's emergency room with multiple stab wounds and a blood-alcohol content of 0.232. The patient refused to consent to a surgical procedure that the defendant wished to perform. *Id.* at 369, 517 N.Y.S.2d at 7. Believing that the patient was incompetent to consent and in a life-threatening situation, and having failed in attempts to obtain consent from the patient's family, an exploratory laparotomy was performed against the patient's wishes.[7] *Id.* The patient sued the hospital for assault, punitive damages, and malpractice. The trial court denied summary judgment on whether an emergency situation existed and whether the patient was sufficiently impaired by alcohol to render him incompetent. The appellate court agreed

that unresolved factual questions existed with regard to the existence of an emergency and the question of whether intoxication vitiated the consent requirement. *Id.* Moreover, the amicus brief directs our attention to several cases that hold that alcohol intoxication can legally impair a patient's capacity to refuse medical treatment. *See Blackman v. Rifkin*, 759 P.2d 54, 58 (Colo.App.1988) (intoxication coupled with head trauma permits emergency-room physicians to restrain patient and imply consent necessary to treat medical condition); *Grannum*, 70 Wash.2d at 307, 422 P.2d at 814; *cf. State v. Hockenhull*, 525 A.2d 926, 929 (R.I.1987) (intoxication may be grounds for diminished-capacity defense such that an assailant cannot form specific intent necessary to commit murder).

We believe that the effect of intoxication does not render every patient incapable of providing informed consent. Whether intoxication affects a patient's capacity to make medical decisions is instead a question of fact for the jury. *Oates*, 131 A.D.2d at 370, 517 N.Y.S.2d at 7; *Grannum*, 70 Wash.2d at 307, 422 P.2d at 814; *see Schiller*, 148 N.J.Super. at 173, 372 A.2d at 363.

## D

After the exposition of each stratum of the legal standards involved in these interrelated issues, we consider the applicable standards of review. The plaintiff asserts that we are precluded from considering either the credibility of the witnesses or the weight of the evidence because defendant did not file a motion for a new trial before it appealed. *See Gramolini v. Marzalkowski*, 102 R.I. 85, 88, 228 A.2d 537, 538 (1967). We need not address this standard because we neither pass on the credibility of the testimony nor weigh the evidence. The focus of our inquiry concerns what the judge permitted the jurors to hear, not how the jurors evaluated what they heard.

7. A laparotomy is "any surgical incision into the peritoneal cavity, usually performed under general or regional anesthesia, often on an exploratory basis." Mosby's Medical, Nursing, & Allied Health Dictionary, 676 (3d ed. 1990).

The appropriate standards of review concern expert testimony and jury instructions. We recognize that it is within the trial justice's discretion to determine whether the testimony of an expert witness is admissible. *State v. Ordway*, 619 A.2d 819, 823 (R.I.1992). In passing on the admissibility of expert testimony, the trial justice must determine that the testimony is relevant and will be helpful to the jury. *Id.* Upon review, we shall "not reverse the decision unless 'the trial justice abused his [or her] discretion, thereby causing substantial injury to the party seeking the admission of such evidence.'" (Brackets in original.) *State v. Gardner*, 616 A.2d 1124, 1128 (R.I.1992). Applying this standard of review, we believe the trial justice has abused his discretion.

■■■ The doctrine of informed consent must, at times, yield to the practical considerations of emergency medical treatment. We recognize that the trial justice ruled on the basis of our holding in *Wilkinson*, yet we conclude that he misinterpreted that holding and his rulings caused substantial injury to defendant. The rulings therefore amount to an abuse of discretion. Under the emergency exception to informed consent it is within the domain of the jury to engage in factfinding concerning the existence of an emergency and a patient's competence to consent. The record contains evidence of sufficient quantity and quality to tender jury issues on the existence of an emergency and plaintiff's competence to consent to treatment.

■■■ A trial justice is also obligated "to charge the jury properly by framing the issues in such a way that the instructions 'reasonably set forth all of the propositions of law that relate to material issues of fact which the evidence tends to support.'" *Morinville v. Old Colony Co-Operative Newport National Bank*, 522 A.2d 1218, 1222 (R.I.1987); *e.g., State v. Caruolo*, 524 A.2d 575, 584 (R.I.1987). The trial justice may use his or her own words as long as he or she states the applicable law. *State v. Tooher*, 542 A.2d 1084, 1088 (R.I.1988). Read in the context of the entire charge, we find that the trial justice's instructions in this case improperly stated the applicable law and did not reflect all the facts material to the determination of the case. *See Caruolo*, 524 A.2d at 584.

Accordingly the trial court erred in ruling and instructing the jury that a patient must be of generally unsound mind or legally incompetent to be incapable of consenting or objecting to emergency medical treatment and that intoxication does not abrogate the right to informed consent.

## IV

We next consider several issues related to the focal point of this case. One of the trial justice's rulings raised the issue of who may testify on the effect of a patient's intoxication. One element of the offers of proof restricted by the trial justice was the use of experts to inform the jury on the effects of intoxication.

■■■ The trial justice has the discretion to determine whether the testimony of an expert witness is admissible. *Ordway*, 619 A.2d at 823. We believe that he abused that discretion on this issue. In his ruling the trial justice relied on the dicta in *State v. Fogarty*, 433 A.2d 972, 976 (R.I.1981), in which we observed that "intoxication is a condition that men and women in general are capable of comprehending." Contrary to the trial justice's statements, in the *Fogarty* opinion we considered testimony on intoxication by lay witnesses who had an opportunity to observe the intoxicated defendant. Moreover, we permitted expert testimony and set forth the predicates for such testimony. *Id.* at 976–77. In accord with our holding today, the *Canterbury* court recognized the need for expert testimony in nondisclosure cases. 464 F.2d at 791. The court stated that if a physician asserts an emergency privilege in defense to a nondisclosure suit, expert testimony is needed concerning the existence of any emergency claimed. *Id.* at 792.

The defendant also objected to the trial justice's admonition to the jury on the issue of plaintiff's combative nature. The trial justice instructed the jury in these words:

"You are not to be swayed if you determine that Mr. Miller was uncooperative in Rhode Island Hospital, or was combative, or belligerent. The law does not require us to be meek and mild and polite. We don't have to be civil to anybody. Society might ask that, but the law does not. Don't inject that into your deliberations."

The trial justice is required to instruct the jury on the "propositions of law that relate to the material issues of fact the evidence tends to support." *Caruolo*, 524 A.2d at 584. Under that standard we conclude that the trial justice erred. We believe that a patient's intoxication may have the propensity to impair that patient's ability to give informed consent. The jury is entitled to consider evidence that adds to or detracts from its factual inquiry on intoxication. As such, in its deliberations the jury may include statements or observations related to intoxication. We believe that the breadth of the jury's inquiry compels us to find that the trial justice's instruction on the plaintiff's uncooperative nature limited consideration of facts material to the determination of the case.

For the aforementioned reasons the defendant's appeal is sustained. The judgment of the Superior Court is vacated. The papers of this case are remanded to the Superior Court for a new trial consistent with this opinion.

WEISBERGER, J., did not participate.