**Gloria POLA**

v.

**HEALTH–TEX, INC.**

**No. 91–131–M.P.**

Supreme Court of Rhode Island.

April 15, 1992.

Robert Thurston, Lauren Jones, Jones Associates, Providence, Daniel Carrillo, Carrillo & Cordeiro, Warwick, for plaintiff.

Gregory Boyer, Boyer, Reynolds & De-Marco, Providence, for defendant.

Before FAY, C.J., and KELLEHER, WEISBERGER, MURRAY and SHEA, JJ.

## OPINION

SHEA, Justice.

This matter comes before the Supreme Court on Health–Tex's appeal by writ of certiorari from a decree of the Workers' Compensation Appellate Division that reversed the decision of the trial court and held that a medical procedure called a ther-mography was a compensable diagnostic procedure under the Workers' Compensation Act. For the reasons that follow, we reverse the decree of the Workers' Compensation Appellate Division and determine that thermography is not a compensable diagnostic procedure under the Workers' Compensation Act.

On March 2, 1984, Gloria Pola (Pola or employee) injured her back and neck while working at Health–Tex, Inc. (Health–Tex or employer). Pursuant to a memorandum of agreement employee received workers' compensation benefits from March 3, 1984, until November 27, 1984, when she returned to work. In March 1984, employee was referred to Dr. Alan Perl by her treating physician, Dr. Arthur Benson. Doctor Perl performed four thermograms on employee's spine, lower back, and lower extremities. The total charge for these tests was $725.

Thermography is a method of measuring and displaying the temperature distribution over the body surface. The results of this test show changes in the distribution of temperature throughout the body. The distribution of temperature in a healthy person should be symmetrical. The distribution of temperature in an individual with some sort of physiological disturbance, however, could be nonsymmetrical. Thus, the thermogram is a physiological test that shows whether a function is normal or abnormal. Advocates of thermography insist that it is helpful in diagnosing and treating all types of injuries, including work-related injuries.

In November 1986 employee filed a petition to review in the Workers' Compensation Court, seeking the balance due for the thermography tests performed by Dr. Perl. At trial Dr. Perl testified that the insurer paid $238 of the bill in April 1987. The employee's claim is based on G.L.1956 (1986 Reenactment) § 28–33–5 of the Workers' Compensation Act, which states, "The employer shall * * * promptly provide for an injured employee such reasonable medical * * * or other attendance or treatment * * * as is necessary, in order to cure, rehabilitate or relieve the employee from the effects of [the] injury * * * ."

The trial court determined not only that a thermography does not constitute a procedure recognized by a significant percentage of the national medical community but also that it does not help to cure or rehabilitate the injured employee. In making this determination, the trial court relied on the deposition testimony of Dr. Jack Edeiken, a licensed physician in Pennsylvania, Texas, Florida, and New Jersey. Doctor Edeiken, who has spent many years conducting research on the use of thermograms, testified that a thermogram is "not useful as we know it today" to cure, to rehabilitate, or to relieve an employee from the result of a work-related injury. Doctor Edeiken also testified that Dr. Perl's charge of $725 for the thermogram is "grossly overcharging."

The appellate division reversed the decision of the trial court. The appellate division noted that the issue of whether a thermography is compensable as a reasonable and necessary medical expense under the Workers' Compensation Act is a question of first impression in Rhode Island. In order to decide this issue, the appellate division looked to the medical-malpractice standards established by Rhode Island law. The appellate division determined that the "test of the reasonable necessity of particular medical procedures must * * * be gauged by a like standard of reasonable medical practice *in this or similar localities* in like cases."

Relying on this standard, the appellate division found that the testimony of Dr. Edeiken was not competent to decide the issue of whether thermograms were compensable because he was completely unfamiliar with the standards in Rhode Island. Thus, the appellate division relied on testimony of Dr. Perl and Dr. S. Alan Weinstein, a physician licensed in New Jersey and Missouri. This testimony established that thermography was an accepted diagnostic and clinical tool in Rhode Island that was beyond the experimental and investigation stages. Doctor Weinstein also testified that Dr. Perl's services were justified and necessary in order to cure, to rehabilitate, or to relieve employee from the result of her work-related injury. Relying on this evidence, the appellate division concluded that thermography was an accepted diagnostic and clinical tool and that, therefore, the expenses incurred in performing this procedure are compensable under the Workers' Compensation Act.

■ The issue presented to us in this case is whether a thermogram is a reasonable medical treatment necessary to cure, to rehabilitate, or to relieve an employee from a work-related injury as required by § 28–33–5. In order to answer this question, we must determine what standard should be used in order to decide whether the use of a thermogram to treat, to cure, and to rehabilitate an injured employee is reasonable. The employee asserts that reasonable medical practice in this or similar localities should be the standard to determine if the thermogram is reasonable medical treatment. On the other hand, employer argues that reasonable medical practice on a national level should be the standard to determine if the thermogram is a reasonable medical treatment. We agree with employer.

After careful consideration of this issue, we conclude that the standard for determining what a reasonable medical treatment is for purposes of § 28–33–5 should be whether the medical treatment is accepted by doctors at the national level. Adopting a national standard to determine if a treatment is reasonable will, in our opinion, properly balance an employee's right to the best available treatment for work-related injuries and an employer's concern that it will be required to pay for medical treatments that are unproven and not likely to cure, to rehabilitate, or to relieve that employee from a work-related injury.

We first considered the merits of adopting a national standard in *Wilkinson v. Vesey*, 110 R.I. 606, 295 A.2d 676 (1972). The issue in *Wilkinson* was whether a physician had used the proper degree of skill and diligence in treating a patient. In a footnote in that case we noted that modern systems for transportation and communication, coupled with a proliferation of literature, seminars, and postgraduate courses, allowed all doctors to be familiar

**1324**

with current medical advances. *Id.* at 613 n. 5, 295 A.2d at 682 n. 5. Nevertheless, in *Wilkinson* we ultimately established a locality rule by holding that "[t]he physician's standard of care has been defined as the employment of the same degree of diligence and skill which is commonly possessed by other members of the profession who are engaged in the same type of practice in similar localities." *Id.* at 613, 295 A.2d at 682.

The justification for the locality rule rests on the discrepancy that can exist between state-of-the-art procedures and treatments available to physicians in large, metropolitan hospitals versus what physicians in small, rural communities have available to them. The policy reason behind the rule is to prevent a finding of malpractice on the part of doctors in small, rural areas when the average degree of skill possessed by such practitioners does not equal the average degree of skill possessed by doctors in large metropolitan areas. Of course, doctors should only be held to a standard of care that they can attain given state-of-the-art technology and facilities available. Nevertheless, members of the medical community should be encouraged, for professional and legal reasons, to pursue continuing education that will allow them to keep abreast of current developments.

Applying this reasoning to the present case leads to the conclusion that a national standard should be used to determine if a particular procedure, in this instance, a thermogram constitutes a reasonable medical treatment pursuant to § 28–33–5. Setting a standard to determine what is a reasonable treatment for a work-related injury is much different from setting a standard of care for medical practice. A test, such as a thermogram, may be reasonable even though some medical practitioners do not have the facilities or equipment to perform it. In other words, just because a test, like a thermogram, cannot be utilized because the facilities or equipment is not available does not make the test itself unreasonable. On the other hand, when setting a standard of care for doctors, this court must be sure that all competent prac-

titioners in the community can meet the standard. The locality rule is a rule of common sense because it permits all doctors to meet their duty of care by performing as a reasonably prudent person would in the same or a similar locality. Since the considerations for setting the standard for what constitutes a reasonable treatment and what constitutes a standard of care are so different, we are not bound in this case by the locality rule that we established in *Wilkinson.*

Using a national standard to determine what is a reasonable treatment for purposes of § 28–33–5 is a good method to decide this issue for three reasons. First, the Rhode Island medical community is an integral part of the national medical community and therefore can be expected to be in conformity with advances that occur on the national level. Second, application of a national standard will permit a judge to consider all the research and study conducted throughout the country in order to determine if a treatment is reasonable. Of course, this process should help the judge make a better and more informed decision that should result in the injured worker's receiving the best treatment available. Finally, a national standard will help employers and insurers by establishing one set of standards that eventually will allow employers and insurers to know which treatments are compensable regardless of in which state the injury occurred.

■ In the present case the only testimony addressing the issue of whether a thermogram is an established and reliable medical treatment that is accepted on the national level was offered by Dr. Jack Edeiken. We would point out that Dr. Edeiken was a competent witness in view of the standard we adopt in this opinion. That witness was competent and qualified to testify concerning the unreliability of thermography as a diagnostic tool. Therefore, it was error to reject the evidence he gave on the ground that he was unfamiliar with the state of medical practice in Rhode Island.

Doctor Edeiken stated unequivocally that judged on the basis of his extensive study and research of thermography, thermogra-

phy is "not useful as we know it today." Since thermography is not an accepted medical treatment on the national level, it cannot be a reasonable medical treatment that helps to cure, to rehabilitate, or to relieve an injured worker as required by § 28–33–5. Therefore, the thermogram is not a medical procedure for which an employer must compensate a doctor who performs such procedure on an injured worker.

For the reasons stated, the employer's petition for the issuance of a writ of certiorari is granted, the decree of the Workers' Compensation Appellate Division is quashed, and the papers of this case are remanded to the Workers' Compensation Court, Appellate Division, with our decision endorsed thereon.