DECISION
From November 8, 1991, to November 11, 1991, Albert Carlson was treated by his long-time physician, Doctor R. Bruce Gillie, at Westerly Community Hospital. Mr. Carlson suffered a stroke during this treatment. As a result of the stroke, Mr. Carlson suffered serious brain damage that left him completely incapacitated for the remaining five years of his life. Mrs. Margot Carlson filed suit in behalf of herself and her late husband's estate (hereinafter "plaintiff"), against Doctor Gillie (hereinafter "defendant") alleging that Doctor Gillie negligently diagnosed Mr. Carlson's condition, and that as a result Mr. Carlson suffered the severe consequences from the bleed which, if timely diagnosed, could have been avoided.
A jury trial on the merits commenced on January 8, 1997, and on January 22, 1997, the jury completed its deliberations and rendered a verdict for defendant Gillie. Currently pending before this court is plaintiff's motion for a new trial.
Plaintiff alleges in her motion for a new trial that (1) the jury's verdict was in conflict with the weight of the evidence, (2) that this Court issued certain instructions to the jury prior to their deliberations that are erroneous as a matter of law and constituted reversible error; and (3) this Court's failure to disclose its status as a member of the Board of Trustee's for South County Hospital, which is represented by Tate Elias (defense counsel in the underlying matter), created a situation demanding a new trial.
Defendant objects to plaintiff's motion arguing that the instructions given by the Court were not effected by any prejudicial errors, and that the verdict is supported by the evidence.
Weight of the Evidence
Plaintiff moves for a new trial based on the bald conclusion that the jury's decision did not do justice and was against the weight of the evidence. The standard for reviewing a motion for a new trial is well settled in this jurisdiction. The trial justice must review all the material evidence, passing upon its weight and credibility. Carlin v. Parkview Service, 625 A.2d 212 (R.I. 1993) (Citation omitted.); Tammarino v. Cranston Tennis Club,416 A.2d 698 (R.I. 1980). The Court must set forth in its decision the evidence it accepts or rejects. If the evidence and the reasonable inferences to be drawn therefrom are evenly balanced so that reasonable people could arrive at different results, the trial justice must deny the motion. See Pomeranz v. DeCristofaro,651 A.2d 1230 (R.I. 1994); Carlin, 625 A.2d at 212. If, however, the trial justice finds that the verdict is contrary to the fair preponderance of the evidence and fails either to respond to the merits of the controversy or to accomplish substantial justice between the parties, the trial justice should grant the motion and set aside the verdict. Carlin, 625 A.2d at 212.
Clearly, such a ruling is not warranted based on the evidence that the jury had before it. Both parties presented two distinct theories of this case and there was a plethora of testimony spanning two weeks in support of each theory. Plaintiff alleged that Doctor Gillie should have order a CT scan as soon as feasible after Mr. Carlson's admission to Westerly Hospital on November 8, 1991, rather than wait until Monday, November 11, 1991, when a CT scan was finally performed. Failure to perform such a test prevented Doctor Gillie from discovering that Mr. Carlson had sustained a neurological bleed that could have been repaired before there was further neurological damage. Without such test, plaintiff argues, Mr. Carlson's condition deteriorated so that by November 11, 1991, he suffered a debilitating stroke. Doctor Gillie asserted that when Mr. Carlson arrived at Westerly Community Hospital early in the morning of November 8, he did not have neurological symptoms, usually manifested by headache and a stiff neck. Doctor Gillie believed, erroneously as it turned out, that his patient might be suffering from a heart attack and treated him accordingly. Furthermore, defendant, despite repeated requests by Mrs. Carlson, believed Mr. Carlson's condition prevented a CT scan until he was stable.
In addition to herself and Doctor Gillie, plaintiff presented six expert witnesses:
Doctor Paul Thompson, an internist and cardiologist from Pittsburgh, testified that Doctor Gillie should have been concerned with his patient's neurological condition upon admission. The standard of care for Doctor Gillie should have been (a) intensive care unit, (b) monitoring of the patient, and (c) performance of a CT scan.
Doctor Walter Lentz, a Westerly neurologist, was evasive and not responsive in his testimony.
Doctor Gordon Sze, a neuroradiologist from Yale/New Haven Medical Center, testified that a CT scan can be performed on one who is seriously injured. Doctor Sze examined X rays taken as a result of the CT scan on November 11. His reading of the films indicated that Mr. Carlson had a bleed when he was first admitted on November 8 and that his condition further deteriorated until a stroke occurred.
Doctor Richard Matthay testified that a CT scan should have been performed on Mr. Carlson on either November 8 or 9 as waiting until November 11 to perform this test was too late.
Doctor Robert Harbough, a neurosurgeon, believed that Mr. Carlson did, in fact, present neurological symptoms on November 8 and that the patient needed a CT scan. Mr. Carlson had a bleed before his hemorrhage.
Doctor Steven Kempner of Miriam Hospital, an internist, testified that the standard of care in such a community hospital required the treating physician to check the heart and lungs and perform a CT scan. According to Doctor Kempner, Doctor Gillie deviated from the standard of care. The patient was stable enough to undergo a CT scan earlier than performed. He believed Miriam Hospital to be a community hospital but that Rhode Island Hospital was not.
The defendant, in addition to himself, presented four expert witnesses:
Doctor Edward Tarlov, a neurosurgeon from Lahey-Hitchcock Clinic in Burlington, Massachusetts, testified that he had been reading CT scan X rays for twenty-five years. His reading of Mr. Carlson's films indicated to him that Mr. Carlson sustained a hemorrhage during the night before his admission and treatment by Doctor Gillie. Mr. Carlson was in the process of a developing stroke. He had a stroke from the "outset." According to Doctor Tarlov, Doctor Gillie's treatment of Mr. Carlson was "excellent" and "saved his life."
Doctor David M. Mayer, an internist and chief of the Internal Medicine Department at Kent County Hospital, testified that "Dr. Gillie met all the standards in a community hospital." He indicated that six physicians examined Mr. Carlson and none could determine that Mr. Carlson sustained a hemorrhage.
Doctor Morgan, a neurologist, indicated that Mr. Carlson suffered a stroke after blockage of arteries from blood of a subarachnoid hemorrhage. To him Doctor Gillie's care did not adversely affect the outcome. Mr. Carlson was "in bad shape when he came in [to the hospital]."
Doctor Daryl Gress, a neurologist from San Francisco, testified that the films from the CT scan do not support two hemorrhages as asserted by plaintiff. "Dr. Gillie met the standard of care."
On direct and cross-examination, Doctor Gillie testified that when Mr. Carlson was admitted he did not expect a neurological problem or subarachnoid hemorrhage. If he had, he "would not have admitted him" as Westerly Community Hospital did not have the facilities or physicians to treat such problems.
It is very clear to this Court that the evidence and reasonable inferences that can be made in this case are sufficiently balanced that reasonable people could arrive at different results. As such, this Court cannot substitute its judgment, even if it might be different, for the jury's. The court must deny the motion. It is obvious that the jury decided to accept defendant's theory of the case and that Doctor Gillie performed his duties with what was presented to him at the time of treatment and in accordance with the community standard then in existence. Such verdict is based on what this Court believes to be credible testimony.
Jury Instructions
Plaintiff also alleges error with regard to this Court's jury instructions, asserting that certain statements and comments made by the Court during the instructions were unnecessarily prejudicial. It should be noted that plaintiff's counsel did not object to any of the statements after the instructions were given. A trial judge has considerable latitude in commenting to a jury, provided he makes it clear that credibility and weight of evidence is for the jury alone. Reynolds v. Davis, 179 A. 613
(1935). When a trial justice comments on evidence in its jury instruction, the court must instruct the jurors that they are the sole triers of fact and the only ones to determine credibility of witnesses or weight of the evidence. Frias v. Jurczyk,633 A.2d 679 (R.I. 1993). Additionally such comments must be impartial.State v. Wiley, 567 A.2d 802 (R.I. 1989).
Plaintiff's first allegation is that this Court "vouched" for defendant when it stated that the defendant did not deny that he owed a duty of care to Mr. Carlson. More specifically, the Court stated that "[t]he standard of care which we've spoken, we know the doctor has a standard of care, he would be the first to admit it. He's never denied it. It governs this physician's conduct at all times." (Tr. 12 at 18-21) Such a statement was not vouching for the defendant's credibility. It simply served to indicate to the jury that whether or not a standard of care existed was not an issue. They had no choice but to accept that the doctor must meet a certain standard of care. It is interesting to note that while plaintiff's counsel argues that this statement "vouched" for Doctor Gillie, it was plaintiff's counsel who elicited the admission from Doctor Gillie that he owed Mr. Carlson a duty.
The second statement plaintiff's counsel alleges was prejudicial to plaintiff was this Court's quoting Abraham Lincoln. Such an argument is clearly without merit. This court stated that "I always like to tell my jurors what I've told my lawyers here about how you feel about yourselves after you deliberate. Because you've got to get on with your lives and not look back in the sense of whether you did the right or wrong thing. And I'm reminded of this anecdote about my hero, President Lincoln, and yours, too, in which the president was being unfairly chastised by a committee of congress, and when a witness wanted to go testify in his behalf; the witness, knowing the truth. And Lincoln said to him "don't bother." If I were to try to read, much less answer, all the attacks made on me, this shop might as well be closed for any other business. I do the very best I know how, the very best I can, and I mean to keep doing so until the end. If the end brings me out all right, what is said against me won't amount to anything. If the end brings me out wrong, ten angels swearing I was right would make no difference." And that's the way I want you to feel at the conclusion of this case. (Tr. at 1-2)
This objection by plaintiff is exactly why the Supreme Court and this Court view jury instructions as a whole and in context. This statement was addressed to the jurors and how they should perform their deliberations and how they should feel about them afterward, even if their judgment were viewed as incorrect by outsiders later on. Obviously someone is always going to feel that their judgment was wrong or we would not be here. This is a very difficult situation for jurors. This statement was solely intended to tell the jurors that they must do the best that they can, but that when they are finished they need to get on with their lives and not look back at their decision, not second guess themselves, and not be troubled if others second guess them. The statement had absolutely nothing to do with the merits of the case, the parties, or anything else other than giving the jury some perspective on themselves and their duty. It should also be noted that plaintiff's attorney also quoted Lincoln during the argument telling the jury that even Lincoln was subject to our judicial system and the law.
The last comment plaintiff's counsel alleges was improper and prejudicial to the plaintiff was this Court's comment that the jurors "may also consider and there wasn't much of this, if any but you might consider that 1 or 2 examples, whether the witnesses' testimony has been contradicted by something that the witness wrote or said or did prior to trial." Plaintiff alleges that this comment is factually inaccurate in that on "many" occasions plaintiff's counsel impeached defense witness in this manner.
The statement above was wholly impartial and did not in any way "undercut" the importance of cross-examination. Quite the contrary, the statement was contained in a three-page dialogue instructing the jury about the importance of its role as judges of credibility and how they could fulfill the role. The "1 or 2" was not meant as an absolute quantification of the number of times a witness was successfully impeached by a prior writing or act because such a quantification could only be made by the jury that decides issues of credibility. Rather the quantification was made in the context of the previous and subsequent sentences. The Court stated "[h]ow reasonable was the witness's testimony when considered in light of all the evidence that is in this case, and there has been a lot of it. You may also consider, and there wasn't much of this, if any but you might consider the one or two examples, whether the witness's testimony has been contradicted by something that the witness wrote or said or did prior to trial. You may consider, and there was a lot of this, whether a witness's testimony is contradicted by the testimony of other witnesses or other evidence in the case."
Additionally, all these statements must be viewed in light of the fact this this Court expressly informed the jury that it could determine the facts, and that if anything the Court did in any way indicated that the Court had an opinion in the matter such an impression was erroneous. The Court additionally stated that "I don't want you to think that either my note taking, or my sense of humor, or my comments, or any of these things, would lead you to believe that I have an opinion in this case . . . right now the only opinion that counts is your." (Tr. at 2-4)
These statements all fall within the trial court's discretion to comment impartially on the evidence during jury instructions and as a whole the instructions left it absolutely clear that the jury, and only the jury, as the trier of fact, could determine the credibility of the witnesses.
Plaintiff also asserts this Court committed reversible error when it (1) gave certain allegedly, legally erroneous instructions, and (2) failed to give other suggested instructions.
It has long been held that this Court is not obliged to grant a request to charge the jury in the exact terms requested.McCusker v. Mitchell, 36 A. 1123 (1897). The charge need only adequately cover the law relating to the request (Pickwick ParkLtd. v. Terra Nova Ins., 602 A.2d 515 (R.I. 1992), and be sufficiently clear and comprehensive as to be understood by the jury. Templeton v. Bateman, 159 A.2d 690 (R.I. 1960). If a jury instruction is erroneous, it merits reversal only if it can be demonstrated that the jury could have been misled to the prejudice of the complaining party. Soares v. Ann Hope,637 A.2d 339 (R.I. 1994). When evaluating an allegedly erroneous charge the instructions must be evaluated as a whole in the light of the meaning that a jury of ordinary intelligent lay persons would given them. Hueston v. Narragansett Tennis Club,502 A.2d 827 (R.I. 1986).
In addition to proving such a misleading nature and prejudice, a party must preserve his right to object post trial. Jury instructions that are not objected to on the record prior to the jury's retiring to deliberate become the "law of the case" and are binding on both the jury and the trial judge when considering a motion for a new trial. DiFranco v. Klein,657 A.2d 145 (R.I. 1995).
Plaintiff alleges that this Court's jury instructions were erroneous because they told the jurors not to judge the defendant's actions "retrospectively," or "through the wrong end of the telescope." As with the national standard objection, plaintiff failed to object to the retrospective instructions given by this Court. Thus the issue was not properly preserved for this motion. The Court will, however, address the issue. During its negligence instruction to the jury, the Court stated that "we are going to look at the time of treatment, not through the wrong end of a telescope. When a physician, and one of the issues in this case, let's not kid ourselves, the parties know it, you know it and I know it, is whether or not Dr. Gillie exercised proper and reasonable medical judgment when Mr. Carlson arrived at Westerly Hospital on November 8, 1991. And you are going to look at it from that vantage point. . . . When judgment is exercised, the law requires that the judgment not be negligent." (Tr. at 11) "In determining whether or not a physician is negligent in the exercise of this judgment, you must consider the issues in light of all the facts and circumstances with which Dr. Gillie was confronted with at the time. The test is what should or could have been done in the light of the circumstances on November 8, 1991, and the days subsequent thereto." (Tr. at 11-12)
Such an instruction was legally proper and did not boost defendant's "retrospectoscope" or "Monday Morning Quarterback" argument to the prejudice of plaintiff. Without such an instruction the jury might be misled into thinking that it would be proper to examine Doctor Gillie's actions in light of all they now know as opposed to what the facts were at the time of Doctor Gillie's actions. It would have been error in this Court's opinion not to cure such a possible misconception. Yes, all juries look backwards, but their job is to look back on the facts as they existed at the relevant point in time.
The second allegedly erroneous aspect of this Court's instructions was this Court's refusal to instruct the jury that
 "[f]urther, under Rhode Island law, if a physician, as an aid to diagnosis, does not avail himself of all the scientific means and facilities available to him so that he can obtain the best factual data upon which he can make a diagnosis, such an omission is evidence of negligence. Schenck v. Roger Williams General Hospital, 382 A.2d 514 (R.I. 1978); Wilkinson v. Vesey, 110 R.I. 606
(1972). Therefore, if you find from all the evidence that based on Mr. Carlson's signs and symptoms, a prudent physician would have ordered a CAT Scan before November 11, 1991 and you find that a CAT Scan should have been ordered by Dr. Gillie before November 11, 1991 and that by failing to do so he did not utilize the scientific means of diagnosis at his disposal, you must find that Dr. Gillie was indeed negligent." Wilkinson v. Vesey, 259 A.2d 676, 10 R.I. 606 (1972); Schenck v. Roger Williams General Hospital, 382 A.2d 514 (R.I. 1978) [sic].
The Court repeatedly instructed the jury that when judging Doctor Gillie's conduct they should have due regard for the state of scientific knowledge and/or equipment at the time of treatment. (Tr. at 10-11-13) Such a charge was sufficient and appropriate. Plaintiff's charge was not appropriate in light of the Supreme Court's clarification of Wilkinson in Schenck. In Schenck the court stated that
 "we are aware that once Wilkinson was published, concern was publicly expressed that `if a doctor is to be safe, he may be legally required, no matter what the patient's symptoms may be, to examine his patients in all cases for all possible maladies to which the human race falls victim.' Such a sentiment takes an extremely literalistic view of Wilkinson
because it appears to overlook Wilkinson's factual background and the posture in which the case came before the Court. In Wilkinson we were considering the grant of the defendants' motion for a directed verdict. In such circumstances we were required, as we are in this case, to view the evidence in the light most favorable to the plaintiff."
This language in Wilkinson was not establishing the standard to be applied by the jury in its deliberations but rather was asserting the standard to be applied by a trial judge in considering a motion for directed verdict. The language referred to did not create a jury instruction. Rather, when discussing the legal standard, the Court stated that "[t]he physician's standard of care has been defined as the employment of the same degree of diligence and skill which is commonly possessed by other members of the profession who are engaged in the same type of practice in similar localities having due regard for the state of scientificknowledge at the time of treatment." (Emphasis added.) Wilkinson, 110 R.I. at 613. This is precisely the language used by this Court in instructing the jury. "The rule calling for use of all available scientific aids does not impose a greater burden upon a physician at the diagnostic stage of medical care than during actual treatment. In both instances, the conduct of a physician is measured by that degree of diligence and skill possessed by other physicians in similar localities." Schenck at 516. The Supreme Court "never contemplated that a physician, in making a diagnosis, would be required to rule out any and all possible maladies to which the human race falls victim. It did recognize that in order to assess intelligently his patient's condition, a physician should employ the scientific advancements available to him. When a physician fails to conduct a test, consult a report, or perform an examination, i.e., utilize the scientific means of diagnosis at his disposal, and there is competent evidence which indicates other skilled physicians in similar localities would employ such resources, the diagnostician is not employing the tools of his profession in the skillful manner required of him by law. It is this kind of conduct, and no other, which the court inWilkinson held to be evidence of negligence." (Emphasis added.) Schenck, 119 R.I. at 516-517.
Given this holding, this Court's refusal to give the plaintiff's requested instructions was proper. First, the plaintiff's instruction was worded in absolutes and provided that a failure to do as described above would mean the jury "must find that Dr. Gillie was indeed negligent." Such an outcome, however, is not required because such a finding, according to Schenck, is not per se negligence but rather evidence of negligence. Additionally, plaintiff's request reads Wilkinson in the literalistic manner warned about in Schenck. Furthermore, the present case is significantly different than Schenck as our Supreme Court was then reviewing the trial judge's refusal to permit testimony from a New York expert witness and found that the trial court was in error for so refusing. In this case all expert witnesses called were allowed to testify.
Thus this Court believes its instructions were proper in light of the court's holding in Schenck v. Roger WilliamsHospital.
Plaintiff also asserts that the instruction this Court gave concerning the standard of care owed by Doctor Gillie to Mr. Carlson was erroneous. Plaintiff believes that this Court erroneously placed a geographical limitation on this standard of care not only to a specific community, i.e., Westerly, but even more narrowly to a specific hospital, Westerly Community Hospital. Plaintiff asserts that the definition for "similar locality" should not be of a community hospital but of Philadelphia, New York, and Boston.
In plaintiff's proposed jury instructions and supplemental jury instructions, plaintiff requested that this Court instruct the jury that "[i]n this state, the standard of care imposed upon a doctor is enunciated in Wilkinson v. Vesey, 110 R.I. 606,295 A.2d 676, 682 (1972). A provider of medical care is under a duty to employ the same degree of diligence and skill that is commonly possessed by other members of the profession engaged in the same type of practice, in this case Internal Medicine, in similar localities having due regard for the state of scientific knowledge at the time of treatment." Plaintiff's proposed instructions stated "In this case, Dr. Gillie is a Board Certified Internist who was treating a patient, Mr. Carlson, in an Intensive Care Unit (ICU). If you find that the defendant, Dr. Gillie, failed to satisfy the standard of care of a board certified internist treating a patient in the ICU, you must find that Dr. Gillie is negligent." No legal support for this instruction was cited by plaintiff prior to trial or at trial. Lastly, plaintiff, citing Reilly v. U.S., 665 F. Supp. 976, 983 (D.R.I. 1987); Schenck v. Roger Williams General Hospital,119 R.I. 510, 520 382 A.2d 514, 520 (1977); and Wilkinson v. Vesey, 110 R.I. at 613, requested that this Court instruct the jury that "the phrase localities does not have a parochial meaning. The standard in Rhode Island is no less than the standard existing in Boston, Massachusetts, or New York City."
This Court instructed the jury that "a provider of medical care is under a duty to employ the same degree of diligence and skill that is commonly possessed by other members of the profession engaged in the same type of practice, in this case, internal medicine, because Dr. Gillie is an internist, in similar localities having due regard for the state of scientific knowledge at the time of treatment." (Tr. at 10-11) Additionally, the Court stated to the jury that "you are instructed that in a medical malpractice case, such as the one before you, a physician's duty to his patient is not to cure it, necessarily, although we hope that's the outcome, but to exercise the same degree of diligence and skill as physicians in good standing engaged in the same type of practice in similar localities, including employing consultants, if that's the proper medical judgment, or the scientific equipment that's available at the time. In this case, Doctor Gillie, a board-certified internist, was treating his patient, Mr. Carlson, in an intensive care unit that you've heard referred to as an ICU. Was Doctor Gillie's treatment of Mr. Carlson reasonable, and did it satisfy the standard of care for board-certified internists at the time in November 1991 at Westerly Hospital? And you've heard me say in these instructions, and you've heard evidence adduced from both sides, the standard is the community standard. The community hospital is Westerly. The community in which Doctor Gillie practices is Westerly. There was evidence by both plaintiff and defendant as to what the community standard is. You've heard testimony of the standard in other hospitals. You've got to determine what the standard was and relate to it." (Tr. at 12-13)
Upon the completion of the jury instructions, plaintiff's counsel objected to the above instruction because he alleged the Court "defined the standard at one point is [sic] the standard of Westerly Hospital and the community, in which he practiced. Now, the standard is not Westerly Hospital. I mean, I just place my objection on the record. My understanding is, it's the Westerly Hospital or a similar locality, not just that hospital." (Tr. 22-23)
The legal standard for malpractice is well established. It is "the same degree of diligence and skill that is commonly possessed by other members of the profession who are engaged in the same type of practice in similar localities. (Emphasis added.) See DiFranco v. Klein, 657 A.2d 164 (R.I. 1995); Polav. Health-Tex, 605 A.2d 1321 (R.I. 1992); Sousa v. Chaset,519 A.2d 1132 (R.I. 1987); Marshall v. Tomaselli Bellavance,118 R.I. 190 (1977); and Wilkinson v. Vesey, 110 R.I. 606,295 A.2d 676 (1972). This is the standard the Court instructed the jury to use. The Court referenced this "similar locality" standard twice during its instructions to the jury, and it was only after the second mention that the Court, by way of clarification, referenced Westerly and Westerly Hospital. How can any jury, even one of extraordinary intelligence, determine what the standard is for a similar locality if it is unsure of or does not know the locality in question. Upon concluding its instructions, this Court made it very clear to the jury that they needed to determine the standard in question and to apply it by stating that "there was evidence by both plaintiff and defendant as to what the community standard is. You've heard testimony of the standard in other hospitals. You've got to determine what the standard was and relate to it." (Tr. at 12-13)
Now plaintiffs argue that "similar localities" have been defined and dictated by our Supreme Court as Philadelphia, New York, and Boston." Plf. Mem. at 4 citing Schenck v. RogerWilliams General Hospital, 381 A.2d 514 at 519-520 (R.I. 1977);Wilkinson v. Vesey, 110 R.I. 606 at 613, 295 A.2d 676 (1972); andCavallero v. Sharp, 121 A.2d 669 at 672 (1956). It should be noted that plaintiff's counsel included in his proposed jury instructions just such an instruction but did not object to this Court's failure to give that instruction prior to jury deliberations. The Court will, however, address the argument since viewing this objection in a very broad way the failure to list other localities could be included within the objection.
Plaintiff's argument, however, is erroneous. In Schenck, our Supreme Court found that under the circumstances of that case New York city was a similar locality for allowing an expert to testify as to the standard of care, but the reference point or the community in which the allegedly negligent doctor practiced was Providence. The Court stated that "Providence represents a large metropolitan area whose medical facilities and proximity to Boston, a national medical center, make it a similar locality to a city such as Philadelphia," and thus an expert from Philadelphia, New York, or Boston could testify as to the standard of care in Providence. Schenck at 521. The Court made those determinations referencing Providence, not Westerly. Westerly is not, much to the pleasure of many of its residents, a large metropolitan area no matter what its distance from Boston. Additionally, this Court, unlike the Schenck court, allowed experts from all parts of the United States to testify as to the standard of care. Thus it was not erroneous as a matter of law for this Court to instruct the jury that they must determine the standard to be applied and not instruct the jury that it should apply the standards of a Boston, New York, or Philadelphia hospital to Doctor Gillie.
Finally, plaintiff asserts this Court's failure to instruct the jury on a "national standard" was error.
At no time, that is until after the verdict was rendered, did plaintiff's counsel object that a national standard should have been used by the court. Rather, the objections at trial clearly state that counsel's impression was that the standard should have been "Westerly Hospital or a similar location." (Tr. at 22-23) Additionally, a national standard has not yet been adopted by the Rhode Island courts for any doctor, board certified or not, outside of the informed consent arena. Miller v. Rhode IslandHospital, 625 A.2d 778 (R.I. 1993). In Pola v. Health-Tex,605 A.2d 1321, 1324 (R.I. 1992), the Rhode Island Supreme Court specifically stated that "we first considered the merits of adopting a national standard in Wilkinson v. Vesey, 110 R.I. 606, 295 A.2d 676 (1972). . . . Nevertheless, in Wilkinson we ultimately established a locality rule. . . . The justification for the locality rule rests on the discrepancy that can exist between state of the art procedures and treatment available to physicians in large metropolitan hospitals versus what physicians in small, rural communities have available to them."
Thus, even overlooking the failure of plaintiff's counsel to preserve the "national standard argument" for the motion for a new trial, it was not an error for this Court to fail to instruct the jury as to the national standard because this national standard is not the law of Rhode Island. What the standard was and if it was the same in Providence, New Haven, Pennsylvania, New Hampshire or anywhere else was a matter for the jury to decide, and they were adequately informed of this so as not to be misled or confused to the prejudice of plaintiff.
This judge's service on the Board of Trustees for South CountyHospital
Cognizant of his failure to adequately raise and preserve his argument that the Court should have instructed the jury on a "national standard of care" and aware that he failed to object to the court's failure to give his instruction on "similar localities," plaintiff's counsel seeks to buttress his criticism of the Court's jury instructions on standard of care with a belated, thinly-veiled, ethical attack on this Court. Plaintiff's supplemental memorandum goes to great lengths to describe South County Hospital as a "community hospital." This characterization is an oblique attempt to link this Court's relationship with South County Hospital with the error plaintiff tries to assign to the Court's jury instructions.
Plaintiff's counsel inexplicably mounts this attack not in his original memorandum in support of plaintiff's new trial motion but in a supplemental memorandum. He suggests that this Court's past two-year service as a member of the Board of Trustee's for South County Hospital, which is represented by the firm of Tate Elias (defense counsel to Doctor Gillie in the case at bar), somehow entitles plaintiff to a new trial. Plaintiff must be of the opinion that this Court's service has prejudiced her in some way. Such an assertion, if in fact that is what plaintiff is saying, is wholly unfounded. This Court can state unequivocally that neither its brief relationship with a non-party hospital nor defense counsel's relationship with that hospital (the nature of which is uncertain for this judge is totally unaware of what services Tate Elias provide to South County Hospital or any of its doctors) had any bearing on this trial. It likewise has no bearing on the Court's consideration of plaintiff's post-trial motion.
Plaintiff's counsel knows there is no nexus; he cannot and does not assert otherwise. He simply lays out certain "newly discovered facts" in his supplemental memorandum to create a specter of possible impropriety without ever alleging that those facts infected the trial of this matter.
Even a response by this Court is demeaning to it and our judicial processes. It is difficult to believe that plaintiff's counsel was unaware of my membership on the South County Hospital Board of Trustees, a fact that I have many times made known in court and in chambers. But even while denying prior knowledge of the Court's relationship with South County Hospital, counsel never asserts that such knowledge would have caused him to request that this judge recuse himself. Counsel does not even allege that such information would have even caused counsel to question the Court's impartiality prior to or during the trial. Moreover, he does not suggest any impropriety in the Court's continued consideration of this case. Indeed, counsel notes his respect for the Court, stemming from twenty years' observation, and calls this judge a "highly ethical and competent professional." (Supp.Mem. at 1)
Even if this judge, for some unfathomable reason, had made a pretrial disclosure of his service on the Board of South County Hospital, it would not have made any difference for such service is not grounds for recusal under the circumstances. Article VI, Cannon 3 § E of our Code of Judicial Conduct states that "[a] judge shall disqualify himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned." (Emphasis added.) Here South County Hospital is in no way implicated in the present suit and the lengths to which conflict will be stretched should not go so far as to reach the current situation. With this motion plaintiff is simply trying to turn a "horse chestnut into a chestnut horse," and that is not the purpose behind Rule 59 and motions for new trials.
This Court is a strong believer in disclosure and recusal where facts and circumstances warrant, but this case did not warrant it even though this judge is known as one who "overdiscloses." Since serving as the justice in charge of the civil calendar for Washington County from September 1996, this judge has recused himself in at least eleven cases, including one involving South County Hospital. This Court must be allowed to exercise its judgment on when or whether to disclose or there can never be trust in our system and with our justices. Judicial necessity, too, should not be overlooked. With a state the size of Rhode Island and there being only one sitting justice on the civil calendar in Washington County requires that my recusals be meaningful and not exercised when not required so that trials, settlement conferences, and court mediation may proceed in an orderly and efficient fashion consistent with my being ethically comfortable in hearing the case.
The truth of the matter is that there is no basis for challenging this Court's impartiality. South County Hospital is not a party to this action. Indeed, no hospital is a party to this case as Westerly Hospital was dropped as a party defendant without any assistance from the Court. In addition, as stated earlier this Court is unaware of what services Tate Elias provide to South County Hospital or any of its doctors. This judge did not even know that the firm of defendant's counsel was representing South County Hospital until after this matter went to trial. In fact, this judge only observed attorney Jay Elias, not defendant's trial counsel, at a special board meeting of South County Hospital involving privileges of a physician, which board meeting was held subsequent to this trial. There is no probable way that such minimal contact could influence this judge in any way.
This judge's brief membership on the Board has created no predilection in this judge's mind either for or against hospitals or doctors. Certainly it is not the role of trustees to shield doctors from their own negligence or to lower the standard of care. Judges are required every day to set aside their own experiences and to decide cases fairly based on the law and the evidence. It is a solemn obligation that this Court has sworn to uphold so as to preserve the public trust and ensure that justice is done.
This Court made its evidentiary rulings impartially in this case based on the rules of evidence and notions of fair play and substantial justice. A ruling by me on any evidentiary issue does not mean in any way that I am taking sides; I am simply indicating my view that the law either does or does not permit certain evidence to be introduced.
This Court again impartially instructed the jury based on the law, as previously outlined. If there is error to be assigned to this Court's rulings or instructions, the remedy is an appeal. The remedy is not a wholesale attack on the integrity of the Court.
In the Supplemental Memorandum in Support of Plaintiff's Motion For a New Trial, plaintiff's counsel raises issues that transcend this case and belie his preliminary statement of trust in this Court by the mere assertion of irrelevant facts that unduly raise a semblance of impropriety. In so doing, plaintiff's counsel goes far beyond the scope of his duty to his client. The ethical attack mounted by plaintiff's counsel is a tactical ploy of an overly-zealous advocate who cannot accept the jury's verdict and who is willing to do anything (including attacking the Court and the system) to try and overturn it. I will not be a part of this ploy. If disclosure is necessary in cases like this, when shall disclosure commence or end. In this small state one can begin disclosing contacts with each party, however benign, until we are so caught up in it that we self-destruct to the real detriment of the parties and our system of justice.
The mere recitation of facts by plaintiff's counsel in his supplemental memorandum and the intended implication represents the cruelest tactical ploy for all. It damages our judicial system as well as Mrs. Carlson who has substantially suffered at the loss of her husband and who must now believe, however denied, that she did not receive a fair trial even though a jury of her peers listened conscientiously to the evidence and decided the facts in accordance with the law. The arguments of plaintiff's counsel are, in the words of Abraham Lincoln, "as thin as the homeopathic soup that was made by boiling the shadow of a pigeon that had starved to death."
Motion for a new trial is denied.