Philip **FILOSA** in his Capacity as Administrator DBN/CTA of the Estate of George H. Schubert, and as Executor of the Estate of Margaret R. Schubert

v.

**COURTOIS SAND AND GRAVEL COMPANY, et al.**

**No. 89–576–Appeal.**

Supreme Court of Rhode Island.

May 7, 1991.

Mark H. Grimm, Wistow & Barylick, Providence, for plaintiff.

Charles P. Cavas, William A. Poore, Hodosh, Spinella & Angelone, Providence, Ernest J. Pratt, Blais, Cunningham & Crowe Chester, Pawtucket, Fred J. Vople, Mosca & Volpe, North Kingstown, for defendants.

## OPINION

SHEA, Justice.

This matter comes before the Supreme Court on the appeal of the plaintiff from a judgment for the defendant in a wrongful-death action on grounds that the jury instructions on assumption of risk constituted prejudicial error.

The events giving rise to the lawsuit stem from an explosion and a fire at the Schubert Heat Treating Plant on November 30, 1983. The plant was owned and operated by the decedent, George Schubert (Schubert). The damage was extensive. The explosion and the fire were so intense that the interior and exterior walls were damaged or destroyed. The roof was partially blown away. Among the rubble and debris, a straight interior wall constructed of cement blocks remained freestanding. The wall, approximately nine to twelve feet high at one end, was uneven, and in some places was less than a man's height. Apparently the explosion and the subsequent fire had scorched the wall and blown out the "points," that is, the cement contacts that adhere the blocks together. Consequently it was possible to see through the wall in places where the points were missing. According to one witness, there was nothing holding the blocks together. Evidently, the top of the wall was also leaning.

Schubert hired the Courtois Sand and Gravel Company (Courtois) to clean the debris from the area around the explosion, particularly the street and the sidewalk. In order to do the job, Courtois employed a front-end loader and a small dump truck. Cleanup operations began November 30, 1983, and continued through December 1.

Immediately after the explosion and continuing until his death, George Schubert, his family, and some employees worked the site, attempting to salvage materials from the demolished building. They entered and removed items from the building on both days. It is apparent from the testimony that Schubert had been warned of the danger of going into the building by several people including Raymond Courtois, the owner of Courtois; Harry Baccari, the owner of Ocean State Building and Wrecking Company;[1] Courtois employees; a Providence police officer; and an investigator from the Department of Labor. Consequently an agreement was reached whereby Schubert would inform the equipment operators prior to entering the building to ensure that they would not operate their machinery when Schubert was in the building. According to Henry Schubert, the decedent's son, and others, Schubert understood and agreed to this arrangement. Schubert sometimes did inform the equipment operators when he was entering, whereupon they would stop, and at other times he apparently did not inform them. The equipment would stop operating if workers were aware someone was in the building.

On December 1, 1983, Schubert was attempting to salvage boxes of "stick screws," a part of the inventory that was located in boxes alongside the unsupported wall. Although Schubert informed Baccari and his crew that he was entering the building, Louis McBride, operator of the Courtois front-end loader, did not see Schu-

---

1. Although originally joined in the action as a defendant, the trial justice directed a verdict in favor of Ocean State Building and Wrecking Company after plaintiff rested.

bert or anyone else enter the building, nor was he aware of their presence behind the wall. While Schubert, Steven Fraielli (Fraielli), and Jose Franco (Franco), both Schubert employees, were behind the wall, a section collapsed, pinning Franco up to his waist in cement blocks against a soap machine. At Schubert's direction Fraielli helped free Franco from the cement blocks and then assisted him out of the building. Schubert remained in the building behind the wall. Although the front-end loader's engine was running, it was not then operating. Fraielli then went back behind the wall to assist Schubert. In response to Schubert's question as to what was causing the commotion on the other side of the wall, Fraielli informed him that the front-end loader had begun to operate. Apparently, the front-end loader was on the street, moving slowly in reverse on a course parallel to the building. While Schubert was behind the wall, handing boxes of stick screws to Fraielli, the wall collapsed, killing Schubert.

After completion of all the testimony, Courtois renewed its motion for directed verdict, which was denied. The trial justice then instructed the jury as follows:

"You have heard mention made of the theory of assumption of the risk. Assumption of the risk, if it applies, operates to absolve a defendant of liability for having created an unreasonable risk. When a person voluntarily proceeds, knowing and appreciating the danger, he will be held to have assumed the risk incident to his conduct. When one knowingly accepts the dangerous situation, he essentially absolves defendant of creating the risk; or put another way, the duty defendant owes to plaintiff is terminated.

"To prove assumption of the risk, defendant must establish that George Schubert knew of the existence of a danger, appreciated its unreasonable character, and then voluntarily exposed himself to it. The standard for determining whether a plaintiff voluntarily encountered a risk is subjective. Therefore, you must look to the record to ascertain what this particular individual saw, knew, understood and appreciated. Thus, if you find that on December 1, 1983, that George Schubert knew, understood and appreciated the potential danger associated with the collapse of the wall, and notwithstanding this knowledge, placed himself in a position of danger, his actions will relieve defendant, Courtois, of any duty which they owed him. If you find that George Schubert assumed the risk in his actions, this constitutes a complete bar to his recovery and you must direct a verdict in favor of defendant, Courtois."

On appeal Filosa contends that the trial justice committed prejudicial error when instructing the jury on assumption of the risk as a defense to negligence. Filosa argues that although the trial justice legitimately instructed the jury on assumption of the risk, she nevertheless failed to explain to the jury that the decedent, Schubert, also had to be aware of Courtois's negligent conduct in order to have assumed the risk of that conduct.

■ At the outset we recognize that without a defendant's negligence there would be no need for the defense of assumption of the risk. For if the defendant is found not to have been negligent, then the harm that befalls the plaintiff must either have been the product of another's negligent conduct or simply the result of an accident. Moreover, where there is no negligence, the aggrieved party is no longer a plaintiff but is a victim of accidental misfortune, and one of the clearest and probably most draconian principles to evolve out of centuries of tort law is that accidental harm lies where it falls. *Brown v. Kendall*, 60 Mass. (6 Cush.) 292, 298 (1850). Consequently when the trial justice instructed the jury on assumption of the risk, such instruction necessarily presupposed the existence of negligence on defendant's part.

We recognize that the verdict sheet asked the jury first to consider whether Schubert had assumed the risk of his death and thus having found so, the jury made no findings with respect to negligence. We also recognize that had the jury properly

been asked initially to consider whether Courtois was negligent, the jury, in light of the apparently insufficient evidence of Courtois's negligence, would probably have found in favor of Courtois and thus never would have reached the issue of assumed risk. Nevertheless, the issue before this court concerns assumption of the risk, and to consider this issue, we must assume that Courtois was negligent. To assume otherwise would suggest that Schubert had assumed the risk of an accident—that is, the risk that the wall might collapse on its own. Assumption of the risk, however, is a defense to negligence and should not be construed to encompass accidental harm. Although one could argue, as Filosa did on appeal, that Schubert assumed the risk of an accidental collapse, such a proposition is inaccurate. Absent *Courtois's* negligence, Schubert's death can only be characterized as an accident, and it is of no legal significance to us at this juncture whether Schubert knowingly appreciated and accepted the risks involved. Thus we proceed to analyze the jury instructions on assumption of risk to determine whether Schubert did, in fact, assume the risk of defendant's negligent conduct.

■ It has long been recognized under Rhode Island law that where a person voluntarily and knowingly accepts a dangerous situation, he essentially absolves a defendant for having created an unreasonable risk of harm. *Kennedy v. Providence Hockey Club, Inc.*, 119 R.I. 70, 76, 376 A.2d 329, 333 (1977). Thus arose the concept of assumption of the risk, which may be raised by a defendant as an affirmative defense to negligence. Consequently assumption of the risk, if it applies, terminates the duty of care that the defendant owes to the plaintiff.

■ In determining whether a plaintiff assumed the risk of a defendant's negligent conduct, we must discern from the evidence whether that plaintiff voluntarily exposed himself to a known and appreciated danger. *Drew v. Wall*, 495 A.2d 229, 231 (R.I.1985). The standard is subjective and is keyed to "what the particular plaintiff in fact sees, knows, understands and

appreciates." *Kennedy*, 119 R.I. at 75, 376 A.2d at 332 (quoting *D'Andrea v. Sears, Roebuck & Co.*, 109 R.I. 479, 487, 287 A.2d 629, 633 (1972)).

■ The negligence alleged by plaintiff is that Courtois, through the careless operation of its front-end loader, caused the unsupported wall to collapse upon Schubert, thus causing his death. Did Schubert actually perceive, understand, and appreciate the risk of the wall collapsing because of defendant's negligent conduct? We think this question can only be answered in the affirmative. The wall that ultimately collapsed on Schubert was described by many as obviously unstable without any visible means of support except, perhaps, for the boxes of stick screws that Schubert was removing. That wall had been subjected to concussion, scorched by fire, and saturated with water. The explosion was so severe that the entire side of the building had been blown away, leaving the fatal wall leaning to one side, which slant was visible to the naked eye. It was a situation of obvious danger for those who ventured near. Schubert and everyone else at the scene were able to visualize the dangerous character of the building and, more importantly, of the precariously situated wall. Yet he obviously ignored these signs of danger and persisted in removing salvageable materials.

Furthermore, the record is replete with testimony of witnesses who explicitly warned Schubert of the danger associated with entering the dilapidated building. He was warned repeatedly not only by the Courtois employees but also by a Providence police officer, an investigator from the Department of Labor, an inspector for the Occupational Safety and Health Administration, as well as others. The evidence portrays a concerned, or more accurately, a livid Baccari, crane operator for Ocean State Building and Wrecking Company, who refused to operate his crane until he was assured that Schubert and his employees would remain out of the building. Much to Baccari's chagrin, however, he was told by the chief investigator for the Department of Labor: "We cannot stop a

man from going into a building [when] he owns it." Consequently Baccari sternly informed Schubert that once the crane began operating, "You have to get out of there." The most explicit warning came from the chief investigator, who, upon hearing that someone was entering the building during demolition, told Schubert, "If you have to [enter the building], you have to tell the operators and they will have to stop. * * * [You] could get killed in there. Anything could come down. Nobody has control over anything."

It is apparent from the evidence that the Courtois employees were also aware of Schubert's reckless attempts to remove his property. McBride, the front-end loader operator, warned Schubert "at least a dozen times" not to enter the building for reasons he explained at trial:

> "[Schubert] would start walking up towards the building, going over rubble, and we'd holler at him, 'Get out. Stay out of there.' * * * When you get to a site like this, there's rubble and an exploded building and everything. It's a cardinal rule that nobody, nobody goes near or in anything that's standing or even in the building. That's why we kept telling him, 'Get out, get out, get back.'"

The last warning came from Baccari, who, while pleading with Schubert to abandon any attempt to salvage the boxes of stick screws from behind the wall, warned, "George, if you go in there, you're going to die. There's no support for the wall."

Only moments before the fatal collapse, Schubert even witnessed a portion of that same wall collapse and injure one of his employees, Franco. Schubert was then specifically informed that the front-end loader was operating on the other side of the wall. It had to have been obvious that if the wall collapsed on its own, as it had on Franco, it certainly could collapse while the front-end loader was pushing and sifting through debris in close proximity to the wall. The mere vibration from the engine alone was enough to cause the wall to collapse. Yet Schubert ignored these signs of danger as he had ignored the chorus of warnings. Not only did he refuse to exit the building but he also failed to inform Courtois's employees of his presence behind the wall. The serious risk of injury was obvious. Schubert knew, understood, and appreciated the grave danger associated with that risk. Nevertheless, in the face of imminent danger his only response was "Let's get the stick screws." In our opinion this conduct without question constitutes assumption of the risk. Consequently we find no reversible error in the instruction given to the jury.

For the reasons stated, the plaintiff's appeal is denied and dismissed and the judgment appealed from is affirmed and the papers of the case are remanded to the Superior Court.

WEISBERGER, J., did not participate.