# United States Court of Appeals
## For the First Circuit

No. 08-1519

JENNIFER SHEEHAN,

Plaintiff, Appellant,

v.

THE NORTH AMERICAN MARKETING CORP. and DELAIR GROUP, LLC,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

[Hon. William D. Smith, U.S. District Judge]

Before

Lynch, Chief Judge,
Boudin, Circuit Judge,
and Saylor,[*] District Judge.

Barry C. Reed, Jr. with whom David E. Maglio was on brief for appellant.
John W. Kershaw with whom Mark P. Dolan and Eric E. Renner were on brief for appellee The North American Marketing Corp.
Joseph V. Cavanagh, Jr. with whom Mary C. Dunn was on brief for appellee Delair Group, LLC.

June 30, 2010

[*]Of the District of Massachusetts, sitting by designation.

**Saylor, District Judge.** This is an appeal of a decision granting summary judgment in a product liability action arising out of a tragic swimming pool accident. Plaintiff-appellant Jennifer Sheehan is a resident of Rhode Island. Defendants-appellees The North American Marketing Corp. ("NAMCO") and Delair Group, LLC, are a seller and manufacturer, respectively, of swimming pools. Jurisdiction is based on diversity of citizenship.

Sheehan suffered a catastrophic injury in 2002 when she broke her neck attempting to dive into a shallow, above-ground pool. As a result of the accident, she was rendered a quadriplegic. She brought suit for negligence, strict liability, breach of express warranty, and breach of implied warranty, alleging in substance that the design of the pool was defective. The district court granted summary judgment on the grounds that Sheehan assumed the risk of serious injury when she attempted the dive and that her proof of proximate cause was unduly speculative. While we are less certain as to the causation issue, we find that the assumption of risk defense applies as a matter of law. We accordingly affirm.

I.      **Background**

        A.    **Events Prior to the Injury**

On August 8, 2002, at about 1:30 p.m., Sheehan and Marvin Nadiger drove to the Islander Restaurant in Warwick, Rhode Island. Sheehan was then thirty-two years old. At the restaurant, the two

shared a scorpion bowl, a drink made with fruit juice and alcohol. After leaving the restaurant, they drove to the Oakland Beach Club in Warwick, where Sheehan drank two or three twelve-ounce beers and had one or two shots of tequila. They then drove to Nadiger's home in Warwick, arriving at approximately 5:30 p.m. Not long after arriving, Nadiger, Sheehan, and Nadiger's three children decided to go swimming in the pool located in his backyard.

### B. The Structure of the Pool

The swimming pool was an above-ground "Johnny Weismuller Safari" model manufactured by Delair and sold by NAMCO.[1] It was 18 feet in diameter and four feet high. At the time of the incident, the pool was filled with about three and one-half feet of water. A ladder over the edge of the pool was used for entry and exit. There was no decking or other platform next to the pool.

The top perimeter of the pool was covered by a piece known as a "coping." The coping was made of flat extruded aluminum with ridges or grooves on its surface. It was approximately six and one-half inches wide inches wide. Its function was to connect the pieces of the pool wall and prevent damage to the top surface of the wall.

It is undisputed that the coping was not intended to be stood upon or used for diving.

---

[1] Delair manufactured the pool wall and frame, but not the ladder, liner, filter unit, or skimmer.

## C.    The Warning Labels

The pool contained at least four relevant warning labels.

First, there was a warning sign on the coping where the ladder entered the pool.  That sign stated "DANGER" in bold red capital letters against a white background.  That was followed by the words "NO DIVING - SHALLOW WATER - DIVING MAY CAUSE DEATH OR PERMANENT INJURY."  Those words were in bold black capital letters. There was also a pictogram showing a person striking his head on the bottom of the pool, with red lines suggesting an injury to the neck; the drawing was in a red circle with a red diagonal slash across it.

Second, there was a sign stating "DANGER - NO DIVING - SHALLOW WATER" on the inside portion of the coping above the waterline, visible to persons within the pool.  The warning faced the inside of the pool, approximately one-third of the way around the circumference from the ladder.  The sign on the coping was approximately 1.25 inches high in bold red capital letters against a white background.

Third, there was an identical sign stating "DANGER - NO DIVING - SHALLOW WATER" approximately two-thirds of the way around the pool from the ladder.

Fourth, on each of the three slip-resistant ladder treads on the outside of the pool, there was an embossed sign that stated "DANGER - SHALLOW WATER - DO NOT DIVE OR JUMP" in capital letters.

-4-

Sheehan testified that she did not read the warnings, but even if she had, she would have dived anyway.

### D.    **The Injury**

Sheehan used the ladder when she first entered the water, and several times after that to help the children out of the pool.[2] While playing with the children, but before attempting her first dive, Sheehan noticed that the "thin metal" coping around the top edge of the pool "wasn't springy, but it wasn't sturdy either. It was kind of loose."

After playing in the pool for about thirty minutes, Sheehan hoisted herself up into a sitting position and then to a standing position on the coping. She stood on the coping for about twenty seconds and then performed a shallow dive, during which she intentionally aimed across the pool and not down. Sheehan testified that she was aware that diving into shallow water could be dangerous because she could hit her head on the bottom of the pool. However, she also testified that the only danger she thought she was facing was that she could get scraped on the bottom of the pool, and that she had never heard of anyone getting hurt from diving into shallow water.

Sheehan successfully executed her first dive without injury. She came up out of the water in front of Nadiger, who was

---

[2] Sheehan was a reasonably experienced swimmer who had swum before in above-ground pools.

in the pool. According to Nadiger, at that point he said, "Can't you read? You can't dive," and pointed to the warning on the side of the pool. He testified that both of them then laughed.[3]

Sheehan then climbed onto the same part of the coping to attempt a second dive. She again pulled herself up into a sitting and then a standing position on the coping. After standing on the coping for about ten seconds, she attempted to perform a shallow dive. As she was attempting to dive, she lost her balance and entered the pool at a steep angle, described by witnesses as a "jackknife." She struck her head on the bottom of the pool, which caused her to suffer a burst fracture of the C5 vertebra. The injury rendered her a quadriplegic.

Sheehan testified that she did not know what caused her to lose her balance or how she slipped during her second dive: "I don't know. I just lost my balance and slipped." She does not know where her arms and feet were positioned before and during her second dive, nor does she know how she entered the pool during her second dive. She could only recall looking at her feet as she stood on the coping and then entering the water.

Sheehan's blood-alcohol level, which was taken at the hospital when she arrived later that evening, was 0.16%. According to the report of the toxicologist, her blood-alcohol level at the

_____

[3] Sheehan testified that she did not remember any conversation after the first dive.

time of the injury was likely even higher, between 0.169% and 0.178%.  Individuals with this blood-alcohol level typically show outward signs of intoxication--e.g., a staggered gait, impaired vision, and decreased reaction time--though Sheehan herself denied feeling any impairment from the alcohol while diving.

### E.    Expert Evidence

All parties submitted expert reports in support of their positions in the summary judgment proceedings.  There is no dispute that Sheehan's injuries were caused by the top of her head striking the bottom of the pool.  One of Sheehan's experts suggested that the injury could have been avoided if she had successfully performed her second dive in the same manner as the first dive.[4] Sheehan also offered evidence to support her allegation that the coping was defective in its design and was the proximate cause of her injury.

Her engineering expert, Gaston L. Raffaelli, opined that

---

[4] This opinion was based primarily on the following testimony by Sheehan:

> Q: Now the second time you went in the water you were preparing to do the exact same thing?
>
> A: I was going to prepare.  I just didn't get that far.  I fell before I got to.
> . . .
> A: I know I lost my balance on that little decking and it propelled me into the pool.
> . . .
> A: It wasn't springy, but it wasn't sturdy either.  It was kind of loose.

the coping was defective because it was unstable and narrow. He stated that it was foreseeable that pool users would use the narrow coping as a resting place and that swimmers would easily hoist themselves onto it because it was only a few inches above the water. He further opined that it was foreseeable that pool users would stand on the coping and re-enter the pool by either jumping or diving into it. He also stated that the presence of the narrow and unstable coping was a danger to pool users because they could lose their balance and topple into the pool in an uncontrolled manner. In Raffaelli's opinion, Sheehan's injury would have been avoided had the defendants designed the pool in a way to prevent pool users from standing on the coping. He suggested that this could have been accomplished by installing a design modification, such as a cap, that would prevent users from accessing the coping of the pool.

Her aquatic safety expert, Thomas C. Ebro, expressed a similar opinion.[5] He opined that the narrow and unstable nature of the six-inch coping was inherently dangerous because pool users could easily stand on top of it, thereby subjecting them to the risk of losing their balance and falling into or out of the pool. He also suggested that the manufacturer should have incorporated a rounded cap over the coping to prevent pool users from standing on

[5]At his deposition, Ebro testified that he had to "fill in the blanks" when reaching his opinion because Sheehan did not recall how she entered the pool.

-8-

or obtaining access to it. He stated that, in his opinion, had the defendants incorporated such a design, Sheehan's injuries would have been avoided.

## F.    The District Court's Ruling and the Appeal

On April 2, 2008, the district court granted the defendants' motion for summary judgment on all counts. It held that as a matter of law Sheehan assumed the risk of her injury when she decided to dive from the coping into the shallow water of an above-ground pool. On that basis, the court dismissed the negligence and strict liability claims.

As to the breach of implied warranty claim, the court held that Sheehan could not establish that the allegedly defective design of the pool was the proximate cause of her injury; it concluded that because she could not recall how she entered the pool, her expert's testimony was based upon speculation and conjecture.[6]

Sheehan now appeals that decision. She contends that the district court (1) erroneously concluded that the expert evidence as to the proximate cause of her injuries was based on improper speculation; (2) failed to recognize that a legitimate question of

_____

[6] The district court also concluded that plaintiff had made no factual allegations that she had relied on any express warranty made by defendants, and in any event had not addressed the issue of express warranty in her brief in opposition to summary judgment, thereby waiving any such claims. Sheehan does not challenge that conclusion on appeal.

-9-

fact existed as to whether she fully appreciated and understood the risk of sustaining a serious injury; and (3) failed to consider her intoxicated state as a relevant factor under the assumption of the risk doctrine.

II.     **Analysis**

        A.     **Standard of Review**

We review the district court's grant of summary judgment de novo. See Triangle Trading Co., Inc. v. Robroy Indus. Inc., 200 F.3d 1, 2 (1st Cir. 1999). Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits, show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). We view the record in the light most favorable to the non-moving party and resolve all reasonable inferences in its favor, without weighing the evidence or evaluating the credibility of the witnesses. See Clifford v. Barnhart, 449 F.3d 276, 280 (1st Cir. 2006). The district court's decision may be upheld even if we reject its rationale, provided that we find independently sufficient grounds in the record. Id.

        B.   **Nature of the Alleged Design Defects**

In a products liability action under Rhode Island law, the plaintiff must prove the following five elements: (1) that there was a defect in the design or construction of the product; (2) that the defect existed at the time the product left the hands

of the defendant; (3) that the defect rendered the product unreasonably dangerous; (4) that the product was being used in a way in which it was intended at the time of the accident;[7] and (5) that the defect was the proximate cause of the accident and the plaintiff's injuries. Jodoin v. Toyota Motor Corp., 284 F.3d 272, 276 (1st Cir. 2002) (citing Raimbeault v. Takeuchi Mfg. (U.S.) Ltd., 772 A.2d 1056, 1063 (R.I. 2001)).[8]

Sheehan alleges three different types of design defects. First, she contends that the coping was too narrow, which caused her to lose her balance when she stood on it to dive. Second, she contends that the coping was unstable, which also contributed to her loss of balance. Third, she contends that the coping design tempted her to climb on it to dive, and that it should have been designed

---

[7] The term "intended use" encompasses the reasonably foreseeable consequences of normal use, even if those uses were not actually intended by the manufacturer or seller. See Turcotte v. Ford Motor Co., 494 F.2d 173, 182 (1st Cir. 1974); Ritter v. Narragansett Elec. Co., 283 A.2d 255, 260 (R.I. 1971). A reasonable jury could find that injuries sustained from diving from the edge of an above-ground swimming pool are risks that are reasonably foreseeable to manufacturers and sellers of such pools. NAMCO and Delair do not argue otherwise.

[8] Sheehan asserted claims for strict liability, negligence, breach of implied warranties of merchantability and fitness of purpose, and breach of express warranty. For the reasons stated above, Sheehan is deemed to have abandoned her express warranty claim for failure to address the issue in the district court or on appeal. She has not argued in this appeal that her implied warranty claims should be considered separately from her strict liability and negligence claims, or that the doctrine of assumption of risk should not also apply to those claims. We assume that all claims should be analyzed together.

so that it would have been difficult or impossible to stand on it at all.[9]

### C.    **Proximate Causation**

The first issue is whether Sheehan produced sufficient evidence of causation to survive summary judgment. As noted, under Rhode Island law, a plaintiff must prove, among other things, that any design defect was the proximate cause of her injuries. Raimbeault, 772 A.2d at 1063; Thomas v. Amway Corp., 488 A.2d 716, 719, 721-22 (R.I. 1985).[10] Causation may be shown by direct or circumstantial evidence, but inferences drawn from circumstantial evidence "may not rely upon mere conjecture or speculation to establish essential elements" of the claim. Thomas, 488 A.2d at 722.

The basic facts as to causation are undisputed, if somewhat incomplete. Sheehan, who had been drinking, decided to dive from the coping of a shallow, above-ground pool into three and one-half feet of water. After completing a successful shallow dive without injuring herself, she climbed back onto the coping for the

_____

[9]The theories are apparently inconsistent. Anything that made the coping broader or more stable (and therefore safer to stand on) would also presumably make it a more tempting platform from which to dive. Anything that made the coping more difficult to stand on (such as a rounded cap) would make it more likely that a person standing on it would lose her balance.

[10] Proximate cause includes the concepts of "factual," or "but-for," causation and reasonable foreseeability, sometimes referred to as "legal" causation. See English v. Green, 787 A.2d 1146, 1151 (R.I. 2001). Only factual causation is disputed here.

-12-

purpose of executing a second dive. She stood on the coping for about ten seconds. She then lost her balance and slipped. Sheehan said she was "preparing" to make a dive but cannot testify as to whether she started the dive or not. She fell into the pool at an angle that witnesses described as a "jackknife" and hit her head on the bottom of the pool. Both of Sheehan's experts opined that she lost her balance because the coping was narrow and unstable.

The district court reasoned that Sheehan's inability to recall how she entered the pool precluded her from establishing proximate causation. In the absence of any additional evidence, Sheehan arguably cannot show that had the coping been less narrow or unstable she would not have fallen. A number of other possible factors, alone or in combination, may have caused her to lose her balance even on a better coping, including intoxication, momentary clumsiness, or the fact that the coping was wet and slippery.

We think it is a close call whether Sheehan's causation evidence is sufficient to survive summary judgment. An alleged defect in a product need not be the only cause of harm to the plaintiff; liability may be found where the defect is a "substantial factor" in bringing about the harm. See Restatement (Second) of Torts § 431 (1965); see also Hueston v. Narragansett Tennis Club, Inc., 502 A.2d 827, 830 (R.I. 1987) (holding that proximate cause "need not be the sole and only cause"). It is uncontested that Sheehan lost her balance and that the coping was narrower than the

length of a normal adult foot.  Common sense and ordinary experience would suggest that it is more difficult to maintain one's balance on a narrow surface, or to regain balance on such a surface once it has been lost.  Similarly, although the evidence of the coping's alleged unsteadiness was thin, perhaps a reasonable jury could infer from Sheehan's observation that the coping "was kind of loose" that instability was a substantial factor in causing her to fall into the pool.

Even if we were confident that Sheehan cannot show that the coping's instability or narrowness caused her fall, she has in any event pleaded an alternate theory of design defect:  the coping should have been designed to prevent anyone from standing on it. Her engineering expert opined that the manufacturer should have considered an alternative design that included a curved cap, rather than a flat surface.  Sheehan argues that but for the "tempting invitation" to dive into the pool presented by the flat coping, she would not have been in a position to injure herself.  This theory has the virtue of sidestepping the proximate cause issue raised by her inability to recall exactly how she came to enter the water. The jury would not need to speculate about the cause of the accident, as the lack of a rounded cap could be a substantial factor in causing Sheehan's injury regardless of how she fell.

But the "tempting invitation" theory is not without its own pitfalls.  As noted above, Sheehan's claims of design defect are

apparently inconsistent; a rounded cap would be a narrower and perhaps more unstable diving platform than a flat coping. It might present less of a temptation to dive but render diving more dangerous for those who attempt it. To succeed on her claim of design defect, Sheehan would need to show that the absence of a rounded cap rendered the pool unreasonably dangerous, see Raimbeault, 772 A.2d at 1063; we are skeptical, given the evidence she has so far produced, that she could succeed.

The proximate causation issue in this case is thus very close, especially when coupled with the "tempting invitation" theory. Rather than deciding these difficult questions, we find that Sheehan's claim should be resolved on the grounds of assumption of the risk.

D.   **Assumption of the Risk**

Assumption of the risk is an affirmative defense in a products liability action in Rhode Island. Mignone v. Fieldcrest Mills, 556 A.2d 35, 41 (R.I. 1989); Rickey v. Boden, 421 A.2d 539, 543 (R.I. 1980).[11]   A plaintiff assumes the risk of injury when she "knowingly accepts a dangerous situation." Kennedy v. Providence

---

[11] Rhode Island has a "pure" comparative negligence system, under which a plaintiff may recover even if she is 99% at fault. See R.I. Gen. Laws § 9-20-4 (2009); Austin v. Lincoln Equip. Assoc., 888 F.2d 934, 935 (1st Cir. 1989). Under Rhode Island law, the common-law defense of assumption of risk survives under the comparative negligence system. Fiske v. MacGregor, Div. of Brunswick, 464 A.2d 719, 726-27 (R.I. 1983); Drew v. Wall, 495 A.2d 229, 231 (R.I. 1985).

Hockey Club, Inc., 376 A.2d 329, 333 (R.I. 1977). In order to establish an assumption-of-risk defense, defendants must prove that the plaintiff knew of the existence of the danger, appreciated its unreasonable character, and voluntarily exposed herself to it. Martins v. Omega Elec. Co., Inc., 692 A.2d 1203, 1205 (R.I. 1997); Drew, 495 A.2d at 231; Rickey, 421 A.2d at 543. The standard is ordinarily subjective, and is based upon "what the particular individual in fact saw, knew, understood, and appreciated." Id. The district court held that NAMCO and Delair were entitled to summary judgment because Sheehan must be held to have known and appreciated the risk of diving into a shallow, above-ground pool.

Sheehan argues that genuine issues of material fact remain unresolved as to her appreciation of the risk of diving. Such disputes ordinarily involve questions of subjective knowledge and are therefore left for the trier of fact. However, if the facts "suggest only one reasonable inference," the issue becomes a question of law for the judge. Rickey, 421 A.2d at 543. Thus, the courts of Rhode Island have found on multiple occasions that a plaintiff assumed a risk as a matter of law. E.g., D'Allesandro v. Tarro, 842 A.2d 1063, 1066-67 (R.I. 2004) (pedestrian assumed risk of injury when he walked backward and tripped and fell over a rock); Raimbeault, 772 A.2d at 1064 (user of excavator assumed risk of injury when he demonstrated equipment on edge of embankment); Filosa v. Courtois Sand & Gravel Co., 590 A.2d 100, 103-04 (R.I. 1991)

-16-

(building owner assumed risk of injury when he reentered partially demolished building); Drew, 495 A.2d at 232 (worker assumed risk of asphyxiation when he restarted internal combustion engine in confined space after already feeling dizzy from fumes); Rickey, 421 A.2d at 543 (building employee assumed risk of injury from inadequate footing when she climbed narrow stairway without handrails); Kennedy, 376 A.2d at 333 (spectator at hockey game assumed risk of injury from flying puck).

That position is also reflected in the Restatement (Second) of Torts, which explains that a plaintiff's own testimony as to his state of mind is "not necessarily conclusive":

> There are some risks as to which no adult will be believed if he says that he did not know or understand them. Thus an adult who knowingly comes in contact with a fire will not be believed if he says that he was unaware of the risk that he might be burned by it; and the same is true of such risks as those of drowning in water or falling from a height . . . .

Restatement (Second) of Torts § 496D, cmt. d.

The risks of diving into shallow water fall into this category, as to which protestations of ignorance from an adult are deemed not believable. A recent Rhode Island case involving a diving injury, although not addressing assumption of the risk, is instructive. In Bucki v. Hawkins, 914 A.2d 491 (R.I. 2007), the Rhode Island Supreme Court considered the duty of care owed by owners of lakefront property to a guest who had injured himself diving into the lake. The plaintiff had dived off a dock at night

-17-

into dark water, striking his head on the lake bottom and fracturing his neck. In the context of considering, and rejecting, whether the property owner's duty of care extended to warning the plaintiff not to dive off the dock, the court noted the following:

> [Plaintiff] chose to dive into dark water without first inspecting the lake to determine its depth. The plaintiff testified that he had executed successful dives off the same dock on three previous occasions and, as a result of these past dives, believed the water was [of a certain depth]. Despite this knowledge, executing a dive into a shallow lake without first ascertaining whether there has been any change in depth since one's last dive is, to put it mildly, ill-advised.
>
> . . .
>
> The danger of diving into shallow water was open and obvious to a twenty-four-year-old man, regardless of whether a sign was erected alerting him to the danger. Therefore, as a matter of law, plaintiff must be held to have had knowledge and an appreciation of this risk.
>
> . . .
>
> Although plaintiff testified that he would not have dived off the dock if he had been warned not to do so, we view this assertion skeptically given plaintiff's inclination to dive from the dock on previous occasions despite knowledge of the lake's shallow waters.

Id. at 496-97; see also Banks v. Bowen's Landing Corp., 522 A.2d 1222, 1225 (R.I. 1987) (holding, in context of considering duty of care of a property owner, that "[a]s a practical matter, the danger

-18-

of diving into shallow water is one of common knowledge . . . ").[12]

Though Bucki is a duty-to-warn case, its underlying rationale remains equally applicable here. The danger of diving head-first into shallow water in an above-ground swimming pool was, or should have been, obvious to a thirty-two-year-old adult woman of normal intelligence. Sheehan knew the depth of the pool, and indeed had been in it for half an hour prior to the accident. If that were not enough, there were abundant warnings against diving on and around the coping, which Sheehan testified she did not read and would have ignored had she read them.

Sheehan seeks to avoid the conclusion that she knew and accepted the risk of diving as a matter of law by parsing the risk involved. By her account, the worst possible outcome that she considered was the risk that she would scrape the bottom of the pool on a poorly executed dive. But the issue is not whether she

---

[12] The weight of authority from other jurisdictions is to the same effect. See, e.g., Neff v. Coleco Indus., Inc., 760 F. Supp. 864, 868 (D. Kan. 1991) (applying Kansas law) (manufacturer had no duty to warn of "patent, open and obvious risk of diving head first into shallow water" of above-ground pool); O'Sullivan v. Shaw, 726 N.E.2d 951, 956-57 (Mass. 2000) (landowner owed no duty to warn of "open and obvious danger" of diving head-first into shallow in-ground swimming pool) (collecting cases); Glittenberg v. Doughboy Recreational Indus., 491 N.W.2d 208, 215 (Mich. 1992) (manufacturer owed no duty to warn of obvious danger of diving into above-ground pool). But see Corbin v. Coleco Indus., Inc., 748 F.2d 411, 417-18 (7th Cir. 1984) (applying Indiana law) (danger of serious spinal injury from diving into shallow water of above-ground pool not open and obvious as matter of law).

subjectively believed that the risk could be minimized or avoided.[13] Under Rhode Island law, when the circumstances are such that a person is presumed to know the risks of her dangerous conduct, she is charged with knowing all the ordinary risks associated with that conduct. Rickey, 421 A.2d at 543. Thus, Sheehan cannot be said to have assumed only the risk of a perfectly executed shallow dive; the risk that she assumed included the possibility that something would go wrong and the dive would not be perfect. Put another way, the risk of a poorly executed or botched dive is subsumed within the risk of diving generally.

Sheehan's best argument, and one which gives us pause, is that she may have assumed the risk of diving but never assumed the risk of falling from the allegedly defective coping. See Corbin, 748 F.2d at 420 (recognizing such a theory on similar facts); cf. Austin, 888 F.2d at 937 (roofer may know risk of falling off roof without assuming risk that roof-sweeping equipment would backfire and propel him off roof); Restatement (Second) of Torts § 496D, cmt. d (assumption of risk will not be presumed if there is evidence of "special circumstances which may conceal . . . danger"). Plainly

---

[13] It would eviscerate, if not eliminate, the defense of assumption of the risk if a plaintiff could defeat it by testifying, in substance, "I knew that the activity was dangerous, and that it bore a risk of serious injury, but I thought I wouldn't get hurt if I were careful." A person who drag-races a car at 120 miles per hour no doubt subjectively believes that he will not lose control of it; but he nonetheless knowingly assumes the risk that such an event may in fact happen.

this case would look different if Sheehan had stood on the coping to dive and fallen backwards onto the ground, or if she had stood on the coping while engaged in some activity other than diving, such as exiting the pool or cleaning it. The pool had no warning against standing on the coping--as opposed to diving or jumping from it--and the language of the warnings as given ("NO DIVING - SHALLOW WATER") at least suggests that the primary problem with diving is misjudging the depth of the water and not tumbling from the coping.

Nevertheless, we agree that summary judgment is warranted on these facts. Sheehan stood on the coping <u>in order to dive</u>, and the injury that occurred was the <u>same</u> one contemplated by the multiple warnings--including on the coping itself. The warnings made clear that no diving should be undertaken (whether from the narrow coping or from anywhere else). Under these circumstances, as a matter of law Sheehan assumed the risk of diving, including the risk that she might fall from the coping into the pool while attempting to dive.

Finally, we are unimpressed with Sheehan's fallback position that the district court failed to take proper account of her intoxication in assessing her subjective knowledge of the risk of diving. She has cited to no case, in Rhode Island or elsewhere, suggesting that voluntary intoxication weighs in her favor. The usual rule in tort is that a person who voluntarily becomes intoxicated "is held thereafter to the same standard as if he were

a sober person."  W. Keeton et al., Prosser and Keeton on the Law of Torts § 32, at 178 (5th ed. 1984); see also Kay v. Menard, 754 A.2d 760, 767 (R.I. 2000).  Charitably construed, Sheehan's argument is that assumption of risk is a subjective doctrine, unlike the usual objective standards of reasonable conduct that prevail in tort, and thus that this is one area where voluntary intoxication may be of unusual relevance.

The problem with the objection is that excuses based on drunkenness are too easy to make and too costly to permit.  See Keeton, supra, § 32, at 178.  Those concerns have equal force when a plaintiff seeks to evade responsibility for assuming the risk of obviously dangerous conduct.  We see no reason to suppose that the Supreme Court of Rhode Island, if presented with the question, would depart from the standard rule in this context.  Cf. McEachern v. Muldovan, 505 S.E.2d 495, 500-03 (Ga. Ct. App. 1998), rev'd on other grounds, 523 S.E.2d 566 (Ga. 1999); Tome v. Berea Pewter Mug, Inc., 446 N.E.2d 848, 852-53 (Oh. Ct. App. 1982).[14]

---

[14] In support of her position, Sheehan cites to Miller v. R.I. Hosp., 625 A.2d 778 (R.I. 1993), an easily distinguished medical consent case.  In Miller, the defendant hospital provided medical treatment to an intoxicated trauma victim over his objection; the court held that whether the patient's intoxication affected his capacity to make medical decisions was a question of fact for the jury.  Id. at 786.  Of course, the doctor in such a situation-- faced with the unpleasant alternatives of committing malpractice for failing to supply care and committing assault in doing so over objection--is entitled to have the extent of intoxication put to a jury.  It is quite a different issue whether one who voluntarily intoxicates himself can use that as an excuse for ignoring risks that would be obvious and self-evident to a sober individual.

That is not to say, of course, that Sheehan does not deserve enormous sympathy for her current tragic circumstances. Nonetheless, under Rhode Island law, there are certain risks that are so self-evident that a person will be deemed to have understood them as a matter of law. Diving head-first into a shallow, above-ground pool is such a risk, and bars recovery here.

**III.** **<u>Conclusion</u>**

For the foregoing reasons, we affirm the district court's decision granting defendants' motion for summary judgment.

<u>        **Affirmed**</u>.